TYSON, Judge.
William S. Langley was charged by indictment with feloniously assaulting John Reid, a conservation law enforcement officer of the State of Alabama, while engaged in the active discharge of his duties pursuant to the provisions of § 13-1-42, Code of Alabama 1975. The jury found the appellant “guilty as charged,” and the trial court sentenced the appellant to nine years imprisonment.
The appellant filed motions to dismiss the charges at the close of the State’s evidence, and also a motion for a new trial, challenging the weight and sufficiency of the evidence, which were duly overruled following a hearing thereon. This appeal followed.
John Reid testified that he was a conservation officer with the State of Alabama on the night of June 11-12, 1979. Together with fellow officers, Captain Griffin, Officer Robert Hill, and Deputy Warden Buster Hough, he departed Grove Hill, Alabama, on Highway 84, and headed for a location known as Hill’s Store, approximately half *869 way between Grove Hill and Coffeeville in Clarke County, Alabama. The officers stopped on a dirt road near a turnoff and observed a “bright light shining” in a field nearby, about a quarter of a mile from Hill’s Store. The officers were acting in response to complaints of night hunting in the area. Officer Reid stated that the officers were acting in the official discharge of their duties and were in uniform on the evening in question.
Officer Reid stated that, together with the other officers, he proceeded into the field in the direction of the bright light. The officers separated and after that Officer Reid did not see the light again. He stated that he then returned to Highway 84 where the following occurred (R. p. 69):
“Q. Did you come back to Highway 84 at any time?
“A. Yes, sir, I came back to the Highway, went to 84.
“Q. After you got on Highway 84, what occurred or happened at that place other than you just waiting or watching?
“A. I was waiting along the road there. I could hear somebody coming through the bushes east of me, maybe one hundred yards, probably. I could hear footsteps coming up the road there. The steps got even with me and I turned the light on and told him to halt.
“Q. What happened then, if anything?
“A. He swung around and pointed at me. When he did, I got down behind the bank. He said, who are you son of a bitch. And fired three, a gun three times.
“Q. What happened then?
“A. After he fired, he hollered out, where are you, you son of a bitch. And then, of course, turned around and ran into the woods, on the south side of 84.
“Q. Mr. Johnny, did you see the man that you halted there on the road that night?
“A. Yes, sir.
“Q. What kind of light did you have, if any?
“A. I had a flashlight with me.
“Q. Did you shine that light on that man?
“A. Yes, sir.
“Q. Did you shine it on his face?
“A. Yes, sir.
“Q. Did you have a good look at the man?
“A. Yes, sir.
“Q. You tell the Jury this man was armed?
“A. Yes, sir.”
Officer Reid stated that he fell down behind the bank and he heard three shots fired toward him, and a few moments later Captain Griffin and Officer Hill came up. As Reid returned to the highway, he found three 30.06 empty shell hulls on the opposite side of the black top road from where he had been standing before diving behind the bank. He stated that he got a good look at the face of his assailant, whom he positively identified in court as the appellant, William S. Langley, and that he next observed the appellant two hours later when he was found in the woods.
Officer Reid stated that Captain Hill and the other officers called for a dog officer from Atmore and he arrived in twenty to thirty minutes. He stated that he then accompanied the dog officer and two other dog boys, and they trailed the appellant into the woods. He stated that they found the appellant standing in a tree top, unarmed, about one and a half hours later.
Officer Reid stated that, as they were returning to the road along a path, they found a six-volt battery and a bottle with about a fifth or quart of whiskey. He stated that he detected the odor of alcohol on the breath of the appellant. He stated that, after they arrested the appellant in the woods, they advised him of his Miranda rights, and, without any threat, intimidation, coercion, or inducement, the appellant stated that he had been in the woods coon hunting.
On cross-examination Reid stated that he initially described the appellant as being six feet, three inches tall, with long hair, and a beard, and this was the description which had been broadcasted on the sheriff’s radio. *870 He described the appellant in court as having longer hair at the time of his arrest, and not being as tall as he originally thought. Reid also stated that the shooting took place around 8:00 in the evening, and that Langley was arrested “about 10:30 that evening.” He stated that he carried a five-cell, long flashlight and had shined it on the appellant when he directed him to halt just before the appellant fired at him. Reid stated that he took the three spent shell hulls, the six-volt battery, and the bottle of whiskey, together with other items seized at the scene, to the State Toxicology Office in Mobile and turned them over to Mr. Carter.
Richard Dale Carter testified that he was a firearms expert with the Alabama Department of Forensic Sciences, formerly the State Department of Toxicology. Mr. Carter testified to the following on direct examination (R. pp. 91-92):
“Q. Would you tell the Jury what a comparison microscope is.
“A. A comparison microscope is a microscope that is set up so it has two sets of viewing heads or lenses, one on each side. And a bullet is mounted on each side— well, the viewing screen, as you look in it, it is split so you can see one bullet on this side of the screen or the cartridge case, and one is put on this side and they can be brought together so that the marks that are on them can be compared.
“Q. Yes, sir. What significance, if any, does an extractor place on a shell when it extracts it from the chamber after being fired?
“A. An extractor is one of the mechanisms that may leave an identifiable mark on an expended cartridge case.
“Q. Are these examined when you make your examination?
“A. Yes, sir.
“Q. What other examination of expended hulls as to trying to locate them to a particular gun, what do you look for?
“A. Depending on the type of weapon. The first thing is the firing pin impression on the primer. Next is the breech-face impression. By that, I mean the back of the bolt or breech of a weapon. When the cartridge is fired, the force of the expanding gases and bullet leaving the barrel forces the cartridge case back against the breechface of the weapon. If there are any irregularities in the breech-face, this breechface acts just like a stamp, and it stamps any irregularities into the base of the cartridge case.
“Also, the extractor and ejector mechanism of the weapon, depending on the weapon, itself, whether it’s semi-automatic clip fed or whatever. There may be clip marks and/or mechanism marks on the expended cartridge case, as it has just worked through the action of the weapon.
“Q. Were you serving in this capacity, doing this type of work on or about January of this year?
“A. Yes, sir, I was.
“Q. Were you located in Mobile?
“A. Yes, sir.”
Mr. Carter testified that he received three expended 30.06 rounds of Remington-Peters shells, better known as Springfield ammunition, and he also received one live round and a gas operated semi-automatic 30.06 742 Remington rifle from Mr. Reid on January 14, 1979.
Mr. Carter testified that, on cross-examination, he had cleaned the rifle as it had mud on it, and part of the barrel showed early signs of rust. He stated that,' after breaking the weapon down and thoroughly cleaning it, he subsequently test fired the rifle. He stated that he could positively testify, based on his tests, that the rifle delivered to him by Conservation Officer Reid had positively fired the three shell hulls which were delivered to him by Officer Reid (R. pp. 106-107, 113). Mr. Carter stated that the three expended shell hulls, the rifle and the one unfired round, had been in his sole possession since delivery to him by Officer Reid until the morning of trial.
Conservation Officer John Reid was recalled and testified that the shooting incident occurred on Thursday evening, and the following Sunday morning he returned to *871 the scene with other officers to search for a rifle and light. He testified that, after looking for about an hour in the general area near where the appellant was arrested on Thursday evening, he found a 30.06 rifle lying in about six to eight inches of water in a creek about fifty to sixty yards off Highway 84. Reid testified that he personally retrieved the gun from the creek bed, and also found lying nearby in the creek bed a light. He testified this occurred about 10:00 on Sunday morning following the arrest of the appellant the preceding Thursday evening. Reid gave the serial number recorded on the 742 30.06 rifle as being 8,700,6681. Reid stated that he delivered the 30.06 rifle, together with one live round found in the chamber of the rifle when he removed it from the creek bed, and three expended shell hulls, to Mr. Richard Dale Carter on January 14,1979, in Mobile.
Jack Knowles testified he was a dog trainer for the State of Alabama on January 11, 1979, and lived at Flomaton, Alabama. Mr. Knowles stated he received a call about 8:00 on the evening of Jamiary 11, a Thursday night, and drove about eleven miles but from Grove Hill on Highway 84 toward Coffeeville. He stated that he carried six dogs with him, but did not use but two of them.
Mr. Knowles stated that he there met Conservation Officer John Reid and several other officers. He stated that he and Officer Reid and two dog boys began to follow the two bloodhounds into the woods. He said that, after following them for about a mile and a half, they came upon a white male standing under a holly bush tree and they - arrested him and took him back to Highway 84. While following a path back toward the highway, Mr. Knowles stated that they found a five-volt battery and a bottle of some kind of whiskey, which they carried back to the highway with them.
On cross-examination, Mr. Knowles stated that he and Officer Reid followed the dogs for approximately one and a half miles, using a flashlight, and that it took about forty-five to fifty minutes before finding the man under the tree. He stated that he came close enough to him to determine that “he was drinking.”
Conservation Officer Robert N. Hill stated that he accompanied fellow Officer Johnny Reid on the night of January 11, 1979, to the vicinity out Highway 84 near Hill’s Store. He stated that the officers first observed a bright light in a “grown field oak patch,” that they were trying to apprehend persons who were night hunting. He stated that he saw Officer Reid come into the woods toward the field, and the light went off. He stated that, about fifteen to twenty minutes later, he heard Officer Reid call “halt” in a loud voice and shine his flashlight. Moments later, Hill stated he heard three rapid shots and called to Officer Reid. Immediately after, he heard a male’s voice say, “You s.o.b.,” and he then ran to the scene, which was about thirty to forty yards away from where he had been standing. He stated that he arrived about the same time as Captain Griffin, and they called for bloodhounds. They did not attempt to go into the woods until the dogs arrived. Hill explained that he observed Officer Reid pick up three spent 30.06 shell hulls on the shoulder of the road on the south side of Highway 84.
The appellant filed two motions to dismiss the charges, which were overruled by the trial court.
The appellant called one Ralph Martin, a twenty-five year old native of Coffeeville in Clarke County. Martin stated he knew the appellant, William S. “Bill” Langley, and that he, himself, had just been released from the County Jail, having filed a bond on January 11, 1979, for night hunting.
Martin stated he drove toward Coffee-ville on Highway 84 and near Hill’s Store was pulled over by Officers Robert Hill and Johnny Reid, two conservation officers.
Martin stated that he drove on to Coffee-ville and there ran into a state trooper in a drive-in and began talking with him. He stated that he overheard a dispatch come over the trooper’s radio, stating that the conservation officers were looking for a man on Highway 84 that was six feet, three inches tall, with long hair and a beard and that he had shot at Johnny Reid.
*872 On cross-examination, Martin admitted that the trooper, in whose car he had been sitting, had given him a speeding ticket about nine months before.
Robert Eugene Booker testified he lived at Eight-Mile in Clarke County on January 11, 1979. Booker indicated that he saw the appellant, William S. “Bill” Langley, about 4:00 on the morning of January 11, 1979, in Coffeeville. Booker stated that Langley, the appellant, “wanted me to take him to pick up a deer,” and that was near Fend-ley’s Store, which is also known as Hill’s Store. He stated this was on a Thursday morning, about 4:00, just before daylight
The appellant did not testify at trial. The trial court gave an extensive oral charge on the applicable law, and at its conclusion also gave some written charges requested by the appellant. Following this, no exception was taken to the court’s oral charge (R. p. 158).
I
The appellant contends that the State failed to produce sufficient evidence to support the charge of unlawful assault on a law enforcement officer in the active discharge of his duties, and, therefore, his motions to dismiss the charges should have been granted.
A careful review of the evidence establishes that the appellant was positively identified at the scene of the assault on January 11, 1979, and again in open court by Conservation Officer Johnny Reid. Moreover, Reid personally found the three expended 30.06 rifle hulls that evening, along with a six-volt battery and a bottle of whiskey. The following Sunday morning, Reid found a 30.06 rifle and a light lying in a creek bed in six to eight inches of water about fifty to sixty yards off Highway 84 near the scene of the assault.
State Toxicologist Carter positively stated in court that, after cleaning the rifle and test firing it, he was absolutely certain that it was the rifle which fired the three shell hulls delivered to him by Officer Reid to the exclusion of any other weapon of similar caliber or make.
Officer Reid and Mr. Knowles, the dog trainer, noticed the odor of alcohol on the breath and person of the appellant.
Officer Hill stated that he overheard Officer Reid tell the appellant to “halt” and saw him shine his flashlight on him. He then heard the appellant exclaim, “You s.o. b.,” then heard three rapid shots being fired.
Both Officers Reid and Hill indicated they were on duty in the active performance of their responsibilities, looking for persons who were illegally hunting at night.
We are of the opinion that the State properly proved the essential elements of the charge against the appellant, and, therefore, his motions to dismiss, and motion for a new trial, were properly overruled. Wright v. State, 49 Ala.App. 539, 274 So.2d 95 (1973); Washington v. State, 57 Ala.App. 465, 329 So.2d 155 (1976); and Kendricks v. State, Ala.Cr.App., 378 So.2d 1203, 1979.
II
The appellant challenges the use of a special prosecutor in this case, the Honorable Wyman O. Gilmore.
The law in Alabama is clear that a special prosecutor'may appear as an assistant to the prosecution with the consent of the court. Handley v. State, 214 Ala. 172, 106 So. 692 (1925), and authorities therein cited. Moreover, such special prosecutor need not show the authority under which he is employed or acting. Handley v. State, supra.
In the case at bar, Mr. Gilmore, at the request of defense counsel and out of the hearing of the jury venire, nevertheless told defense counsel who his employer was (R. p. 46), and the trial court determined that Mr. Gilmore was appearing with the' consent of the State and approved his appearance as such special prosecutor (R. pp. 45-47).
We are of the opinion that the trial court properly permitted Mr. Gilmore to appear *873 in this cause and no error is shown by this record. Handley, supra; Alonzo v. State ex rel. Booth, 283 Ala. 607, 219 So.2d 858 (1969). This Court judicially knows that Mr. Gilmore was the district attorney for the circuit in which he appeared for a number of years.
Ill
Finally, the appellant asserts that the trial court committed reversible error in its oral charge to the jury. This charge appears on Record Pages 152 through 159. The record reflects that no exception was taken thereto (R. p. 158). The trial court will not be reversed on matters asserted in the oral charge of the court when the appellant does not except to same. Cox v. State, 280 Ala. 318, 193 So.2d 759 (1967); Cooper v. State, Ala.Cr.App., 364 So.2d 382, cert. denied, 364 So.2d 388 (1978).
We have carefully examined this record and find no error therein. The judgment is due to be and the same is hereby
AFFIRMED.
All the Judges concur.