491 So.2d 991 (1985)
Willie Henry PEAL
v.
STATE.
6 Div. 176.
Court of Criminal Appeals of Alabama.
May 14, 1985.
On Return to Remand June 10, 1986.
Gary C. Pears, Vestavia Hills, for appellant.
Charles A. Graddick, Atty. Gen., and Bernard B. Carr, Asst. Atty. Gen., for appellee.
TAYLOR, Judge.
Willie Henry Peal was convicted of murder and sentenced to 20 years' imprisonment. On appeal, he presents certain preliminary matters for our consideration.
Defense counsel, Gary C. Pears, contends that appellant was denied a fair trial because a taped confession, which he had no knowledge of prior to trial, was played over his objection for the jury. Mr. Pears alleges "misconduct" and "misrepresentations" by Deputy District Attorney Scott Boudreaux and Deputy District Attorney Don Colee in regard to this incident. Mr. Pears implied that an agreement was reached between himself and these attorneys which agreement was in lieu of a trial court ruling on his discovery motion. As part of this alleged agreement, these attorneys allegedly made representations to Mr. Pears that he would be allowed to see all material evidence regarding this cause and that there existed no material such as the taped statement now in question.
The record is also totally devoid of the contents of the taped statement which was played for the jury. The record contains only the statement, "tape recording played for the jury."
It is apparent that the record is deficient in these respects. Therefore, we *992 invoke Rule 10(f), Alabama Rules of Appellate Procedure, on our own motion as to the omitted tape. The trial court should determine the contents of the statement played for the jury and forward a transcript of such statement to this court.
At the suggestion of defense counsel and upon our own motion it becomes incumbent upon us to further invoke Rule 10(f) and order that a hearing be held in order to determine of what the discovery agreement in lieu of court order consisted and whether this agreement was in fact violated.
REMANDED UNDER RULE 10(f), A.R. A.P., WITH INSTRUCTIONS.
All the Judges concur.

ON RETURN TO REMAND
TAYLOR, Judge.
This case was remanded upon our application of Rule 10(f), Alabama Rules of Appellate Procedure, to supplement a deficient record. The record as originally received, instead of reciting the contents of a tape recorded statement of the defendant which was played to the jury, contained only the statement "tape recording played for the jury." We sought to add the contents of the statement to the record.
Further, counsel for the appellant, Gary C. Pears, alleged the breach of an agreement between himself and assistant district attorneys on the subject matter of a discovery motion. The "Motion for Production and Disclosure" requested, as the first things asked for:
"1. a. Any and all statements purporting to be those of the Defendant, whether made before or after his or her arrest and whether oral, written, transcribed, or otherwise recorded.
b. Any and all reports, notes, or memoranda purporting to relate to such alleged statements of the Defendant which are in the possession of the District Attorney's Office or available to the District Attorney's Office."
Upon remand, the circuit court held a hearing at our behest on the questions of whether or not there had been an agreement between the parties, in lieu of court action on the discovery motion, and, if so, what that agreement was. The assistant district attorney stated for the record, before any testimony was taken, what he understood was to be done in the hearing, and then waived the right to be present and excused himself from the hearing and the courtroom as follows:
"MR. McGREGOR: ....
"As far as I'm concerned and the District Attorney's Office is concerned, I would by Your Honor's indulgence. We have a staff meeting at 11:00 o'clock. If my presence is not required specifically, we can go ahead and go to that and have these matters put on record. And if any party wants me down here to ask questions of a witness, then obviously we will do so.
"THE COURT: All right. No problem.
....
"MR. PEARS: Judge, in light of the fact that Mr. McGregor and Mr. Anderson were not members of the District Attorney's Office on the occasion in question, we have no objection."
Mr. Pears took the stand, under oath, and testified:
"I had two or more discussions with Mr. Boudreaux about discovery, at which time he presented to me documents and letters and graphs and charts from Forensic Science and the Coroner's Office....
"Mr. Boudreaux indicated to me at that time that there would probably be pictures of the victim forthcoming later. I asked whether or not there were any statements or confessions or admissions of the Defendant that I needed to see. At that time he wasn't aware of any such information."
Pears testified that then the case was transferred from Boudreaux to Mr. Don Colee for trial. Mr. Colee, according to Pears:

*993 "... simply reiterated the information that Mr. Boudreaux had already given me, plus he showed me colored pictures of the victim as he lay slain in the house where the shooting took place. There was never any mention of any confession or statements, or admissions....
"... I was fully aware of spontaneous remarks of the Defendant and oral admissions of the Defendant made to the police officers and to the ambulance attendants.... However, at no time prior to trial was I aware that there was a tape recorded confession of the Defendant that was in the possession of the police officers, which was ultimately placed in the possession of Mr. Colee and the District Attorney's Office, which ultimately was introduced in evidence against the Defendant at trial."
He testified that at trial, "... Mr. Colee started asking Lieutenant Knight about a taped confession, something I had no knowledge of. At that time I asked the court to excuse the jury."
Pears then testified as to what was said outside the presence of the jury:
"The court asked Mr. Colee, regarding the tape, basically what is in the tape. And Mr. Colee said nothing much more than his confession to the crime, the fact that he shot Raymond. And the Court basically asked Mr. Colee will there be any surprises. And Mr. Colee said no.
"Now there were two black jurors on the jury. Judge Crowder said well, in light of that, we are not going to play the tape ahead of time. We will just simply play it in front of the jury.
"The jury came back and the tape was placed [sic] in the presence of the jury."
In the statement of Willie Peal, he repeatedly told the officers that he was guilty, interrupting their efforts to explain to him his Miranda rights. There then ensued the sorry and sordid story of the shooting itself, which apparently resulted from these drunken men flipping coins to see which of them would shoot the other, with the loser to be the shooter. In the course of the interrogation, the following occurred:
"SERGEANT MELTON: Had you had any trouble with anybody earlier today?
"THE DEFENDANT: Hey, I had trouble last night, now. Wait a minute. I got blood going down the alley, two god damn colored guys. I shot at them twice.
"SERGEANT MELTON: Naw. Trying to break in your garage. That's another time. We're talking about
"SERGEANT KNIGHT: Had you had trouble with Raymond today?
"THE DEFENDANT: No."
Mr. Colee testified that he first gained knowledge of the existence of the taped confession, "[b]est of my recollection, it was shortly before I put Sergeant Knight on the stand." He further stated, "It's always my general policy to give defense attorneys anything and everything, police reports, whether they had thatwhether it was necessarily discoverable or not, because I just didn't play games. But to the best of my recollection, I discovered it just shortly before putting Sergeant Knight on the stand." He then verified that he told Pears that the recorded statement was basically what he had already told him about the killing. He further testified that Judge Crowder extensively questioned the black jurors in his office about whether they would be affected by the accused having used the words "god damn colored guys" and they told him that they would not.
Mr. Colee further testified as follows:
"Q. When did you first hear the tape in full?
"A: I would think that I would have listened to it prior to putting Sergeant Knight on. I don't know whether he came on at a break at lunch time, possibly, or what. When I discovered it, I doubt very seriously, again I have no recollection, but I doubt very seriously if I would have put a tape into evidence without having listened to it.
"Q: Do you have a specific recollection of having listened to it first?

*994 "A: I really don't...."
He verified that there were at least two black jurors on the jury. He further testified as follows:
"Q: Do you have any rebuttal or objections to my rendition of the facts as they existed in 1983?
"A: Basically I think your testimony is very similar to mine....
There was one difference as far as my recollection of the tape saying "colored" versus what you said. But other than that, that's the only thing I recall."
Colee acknowledged having had several conversations with counsel for the defendant. He further testified as follows:
"A: If there had been a tape of the Defendant or any witnesses that I had known existed, I would have turned them over to you, or made arrangements for you to listen to them with the police department, or whatever was necessary to see that you got that."
Mr. Scott Boudreaux testified:
"I do remember my initial contact with you regarding the case, and much as you have said is correct, that we didn't play any games. The file, except for the Grand Jury notes, was generally available for your inspection. And often times I would provide copies of various things that might have helped you."
He testified that he did not have any objection to or rebuttal of the accuracy of Pears's testimony and added that he was briefly involved in this case and had a great many additional cases for which he was responsible.
The first question which presents itself to us is whether or not there was a binding agreement between the lawyers in lieu of a court order as to discovery. We find as a fact from the undisputed testimony of all three witnesses that the parties did agree as to discovery. We further find that in reliance on such agreement, the defendant's attorney did not insist upon being heard on his motion for discovery. Thereby, he changed his position in reliance on the agreement.
We find as a fact that there was discoverable matter which was not made available to the defense counsel by the state, in violation of the agreement of the parties. Even before the adoption of Rule 18, Alabama Temporary Rules of Criminal Procedure, a defendant was entitled to a copy of his own statement. Ordinarily, judges order that the defense attorney be given a copy of the defendant's statement, or district attorneys give it without being ordered to do so, as a matter of fundamental fairness, or with the expectation that such would eventually be deemed essential to due process. In Mack v. State, 375 So.2d 476, affirmed, 375 So.2d 504, vacated, 448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1134, on remand, 405 So.2d 700 and 405 So.2d 701, this court said, "It will be noted that appellant was given a copy of his signed confession and a copy of the post mortum examination during the hearing on the motion to produce. He was entitled to those two documents...." 375 So.2d at 489.
Standard 11-2.1 Prosecutorial Disclosure, ABA Standards for Criminal Justice, provides in part:
"(a) Upon the request of the defense, the prosecuting attorney shall disclose...
"....
"(iii) Any written or recorded statements and the substance of any oral statements made by the accused ...
"....
"(d) The prosecuting attorney's obligations under this standard extend to material and information in the possession or control of members of the prosecutor's staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or, with reference to the particular case, have reported to the prosecutor's office."
The commentary accompanying this standard states:
"This subparagraph provides for the disclosure of statements made by the defendant.... *995 Pretrial disclosure of such statements is also required by the National Advisory Commission standards, the National Prosecution Standards, and the Uniform Rules of Criminal Procedure. The Federal Rules of Criminal Procedure authorize disclosure of the defendant's statement...."
We here set out the recorded statement of Willie Peal:
"This will be a statement of Willie Peal, a white male, 52, of 200 65th Place North. This statement is made on 2/11/82, at approximately 11 minutes until 6:00 in the East Lake Precinct in connection with the shooting of Raymond McCloud. Present at this time are Sergeant S.M. Knight, and Sergeant C.M. Melton. The case number is J133490.
"Mr. Peal, just like the officer did, I will do again.
"THE DEFENDANT: Uh huh.
"SERGEANT KNIGHT: I'll read this form to you. It's called your Miranda Warning. I know he did it, but I'm going to do it again.
"THE DEFENDANT: All right, sir. It saves it on record.
"SERGEANT KNIGHT: It says you have a right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning.
"All right. I know he read that to you and I just read it to you. Do you understand each of those rights? And do you understand them?
"THE DEFENDANT: Naw, sir.
"SERGEANT KNIGHT: Which one don't you understand?
"THE DEFENDANT: Naw, I ain't got the money to fight it. I ain't got no lawyer or nothing like that. Like I say, I'm guilty. And that's it.
"SERGEANT KNIGHT: Okay. Let me Let's go through them one at a time, though, and we will make it clear. Okay? It says you have the right to remain silent. That means you don't have to talk to me. Do you understand that?"
"(At this point on the tape the Defendant appears to be crying and speaking at the same time and it is difficult for the Court Reporter to understand all of the Defendant's words at this particular point on the cassette tape. However, the Court Reporter will do his very best to transcribe this very short portion of the tape as accurately as possible.)
"THE DEFENDANT: Wait a minute.
"SERGEANT KNIGHT: Okay.
"THE DEFENDANT: Have we been sued on the issuefirst one?
"SERGEANT KNIGHT: I know, Mash [sic]. I know. The officer already told me that. He told me that. I understand that.
"THE DEFENDANT: And I don't.
"SERGEANT KNIGHT: I know. He told me that. But before I'm allowed to talk to you, even though you have told him that, before I'm allowed to talk to you, I've got to tell you what this says on the paper. Okay?
"THE DEFENDANT: Yeah. You can do whatever you want to. Wait a minute.
"SERGEANT KNIGHT: I know you say do what I want to, that you're guilty. But let me go through
"THE DEFENDANT: I'm guilty.
"SERGEANT KNIGHT: All right. Let me go through this with you.
"THE DEFENDANT: I ain't got nothing there.
"SERGEANT KNIGHT: Okay, did you understand that you have a right to remain silent, that you don't have to talk to me?
"THE DEFENDANT: I'm scairt. (sic)
"SERGEANT KNIGHT: Okay. I know, I know. But do you understand you don't have to talk to me?
*996 "THE DEFENDANT: Which(inaudible)should you even talk to(inaudible) And I'll tell you.
"SERGEANT KNIGHT: Okay. You will
"THE DEFENDANT: Now, we bashed. And he wasn't going to shoot. We shouldn't.
"SERGEANT KNIGHT: Okay.
"THE DEFENDANT: (inaudible)
SERGEANT KNIGHT: Well, I understand you're telling me.
"THE DEFENDANT: No hurt feelings.
"SERGEANT KNIGHT: No, I'm
"THE DEFENDANT: Hey, I wonder if I could bum a cigarette.
"SERGEANT MELTON: I don't have one. Remember, I got one when I came in the door.
"THE DEFENDANT: MyYours would be a little bit heavy.
"SERGEANT MELTON: Yeah.
"SERGEANT KNIGHT: That's the only one you've got?
"SERGEANT MELTON: Uh huh. I bummed it when I came in the door.
"SERGEANT KNIGHT: Have you got some cigarettes out there?
"THE DEFENDANT: Supposed to be.
"SERGEANT MELTON: All right. Let me see
"THE DEFENDANT: Hey
"SERGEANT MELTON: if I can get you a cigarette.
Do you want me to try to go through the Miranda here?
"SERGEANT KNIGHT: Yeah.
"THE DEFENDANT: Huh?
"SERGEANT MELTON: Is yourThey call you Max?
"THE DEFENDANT: No. Willie.
"SERGEANT MELTON: What do they call you? Willie?
"THE DEFENDANT: Willie.
"SERGEANT MELTON: Okay. Excuse me, Willie. I understand that you want to talk to us. But before you talk to us, we have to go through these rights, to see if you understand them. Okay? The first one
"THE DEFENDANT: I done said I was going to give it, and then later(inaudible) demand that.
"SERGEANT MELTON: Okay. But before we can talk about that, just like on TV, you know, they make us go through these rights. The first right you have is, you have the right to remain silent. That means you don't have to talk to us. Do you understand that you do not
"THE DEFENDANT: "Hey, I
"SERGEANT MELTON: have to talk
"THE DEFENDANT: Hey, just like I told you, just like it is, I'm guilty.
"SERGEANT MELTON: Okay.
"THE DEFENDANT: Thank you, sir.
"SERGEANT MELTON: Okay. Now, I understand what you're telling me about being guilty. Sit down and I will give you a light.
"THE DEFENDANT: Thank you, sir. Do you want this chair, sir.
"SERGEANT MELTON: No. You sit still. We need you to answer our questions about this first. And then
"THE DEFENDANT: I'm doing
"SERGEANT MELTON: we will talk about what happened after that.
"THE DEFENDANT: the best I can.
"SERGEANT MELTON: Okay.
"THE DEFENDANT: The best I can.
"SERGEANT MELTON: Okay.
"THE DEFENDANT: Right?
"SERGEANT MELTON: Yeah. Just listen to what I'm saying to you.
"THE DEFENDANT: All right.
"SERGEANT MELTON: You have the right to remain silent. And what that means is just like Sergeant Knight has told you, and I have told you, you don't have to *997 talk to us unless you want to. Do you understand that, that you do not have to talk to us?
"THE DEFENDANT: Right.
"SERGEANT MELTON: Okay. Anything you say can and will be used against you in a court of law. You understand that?
"THE DEFENDANT: Uh huh.
"SERGEANT MELTON: Okay. You shook your head. Could you answer yes or no? Because
"THE DEFENDANT: Yes, sir.
"SERGEANT MELTON: Okay. You have the right to talk to a lawyer and have him present while you are being questioned. Do you understand that right? Do you want me to repeat that one for you?
"THE DEFENDANT: Yeah.
"SERGEANT MELTON: Okay. You have the right to talk to a lawyer and have him present while you are being questioned. Do you understand that?
"THE DEFENDANT: I ain't got nothing to be questioned about. I'm guilty.
"SERGEANT MELTON: Okay. But do you understand that warranty?
"THE DEFENDANT: I understand. Is that fair enough?
"SERGEANT MELTON: Okay. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. Do you understand that right?
"THE DEFENDANT: Yeah. Uh huh.
"SERGEANT MELTON: Okay. With those rights in mindDo you want to talk to us now?
"THE DEFENDANT: I'll talk to you.
"SERGEANT MELTON: Okay. Sergeant Knight is going to ask you a few questions at this time.
"SERGEANT KNIGHT: Just go ahead and tell us what happened.
(It sounds as if the Defendant has stopped crying and his words are becoming a little clearer for the rest of the cassette tape.)
"THE DEFENDANT: Now, he had been over there at the house for about seven or eight weeks. And we had matched. My old lady was gone down to my boy's house. I don't even know his phone number. Hey, and we were going to match to see which one was going to shoot the first one. Well, we matched and I lost and I shot him.
"SERGEANT MELTON: Okay. By match, what do you mean?
"THE DEFENDANT: Match with a coin.
"SERGEANT MELTON: Was it one coin or two coins?
"THE DEFENDANT: Two coins matching, just get alike.
"SERGEANT MELTON: So, by the flip of the coin you were supposed to shoot him?
"THE DEFENDANT: Yeah, if I had of lost, he would have shot me.
"SERGEANT KNIGHT: Okay. Whose shotgun is it?
"THE DEFENDANT: It's mine.
"SERGEANT KNIGHT: Did he have any kind of weapon?
"THE DEFENDANT: No. Hey, he laid down on the couch just like a man. If I'd of lost, I'd have done the same thing.
"SERGEANT KNIGHT: Did he tell you to shoot him?
"THE DEFENDANT: Yeah.
"SERGEANT KNIGHT: I saw some shotgunempty shotfired shotgun shells around in the back.
"THE DEFENDANT: Huh?
"SERGEANT KNIGHT: We saw some shotgun shells that had already been shot out in the back.
"THE DEFENDANT: Out in the back? Hey, that's the nightand I sprinkled themthe police come out there where I sprinkled them. Some asses come and opened my god damn garage coming in there.
"SERGEANT KNIGHT: That was at another time?
*998 "THE DEFENDANT: Yeah. Uh huh.
"SERGEANT KNIGHT: Okay.
"THE DEFENDANT: Okay.
"SERGEANT KNIGHT: Had y'all ever played this game before.
"THE DEFENDANT: Huh?
"SERGEANT KNIGHT: Y'all ever done this before?
"THE DEFENDANT: Uh huh.
"SERGEANT KNIGHT: What happened before when you played the game of flip?
"THE DEFENDANT: Ah, a few of them get chicken shit and run out.
"SERGEANT KNIGHT: He didn't run out?
"THE DEFENDANT: No, he didn't run out. He said shoot. And I pulled the trigger.
"SERGEANT KNIGHT: He was laying down on the couch?
"THE DEFENDANT: Yeah.
"SERGEANT KNIGHT: Or in a chair?
"THE DEFENDANT: Naw, he was in the chairon the couch.
"SERGEANT KNIGHT: Okay. Where were you standing when you shot him?
"THE DEFENDANT: In the door there.
"SERGEANT KNIGHT: How far away were you?
"THE DEFENDANT: Here to that wall right there. (indicating)
"SERGEANT KNIGHT: Okay.
"SERGEANT MELTON: You say you were standing in the door. Is it the door going out of the house or in the house, or
"THE DEFENDANT: Coming in the house. The couch is right there on the right.
"SERGEANT MELTON: Okay. You were standing in the front door. Did you go out the door that
"THE DEFENDANT: Naw. Hey, the door was closed, now. I'm going to put it that away. And he said you chicken shit if you don't. And I just cocked the god damn gun and pumped it to it.
"SERGEANT KNIGHT: What you're saying though, isyou know, when you cutwere you standing there when you come in your front door, or were you standing in the door going to the bedroom?
"THE DEFENDANT: Naw. I was standing right there and watching TV. He said you chicken shit if you don't do it. And when he done that, I cocked the mother fucker and shot him.
"SERGEANT KNIGHT: Okay.
"THE DEFENDANT: Is there anything else I can tell you on that?
"SERGEANT KNIGHT: Is that all that happened?
"THE DEFENDANT: That's it.
"SERGEANT KNIGHT: Okay.
"THE DEFENDANT: He said you lost, god damn it. You ain't going to keep your god damn word. He said, now shoot. He said you chicken shit son-of-a-bitch. When he said son-of-a-bitch, that's when he fucked up.
"SERGEANT KNIGHT: Okay.
"THE DEFENDANT: And I fucked up.
"SERGEANT KNIGHT: You don't really think that he meant for you to shoot him?
"THE DEFENDANT: It don't matter. He's dead, ain't he.
"SERGEANT MELTON: Naw. You were there and I wasn't. You say he fucked up. That's your words.
"THE DEFENDANT: That's what I say, he fucked up.
"SERGEANT MELTON: Do you
"THE DEFENDANT: When he called me a mother fucking son-of-a-bitch
"SERGEANT MELTON: Yeah.
"THE DEFENDANT: he shouldn't have done that. And that's when I unloaded on him.
"SERGEANT MELTON: If he hadn't of done that, would you have shot him?
"THE DEFENDANT: No. I wouldn't.
*999 "SERGEANT MELTON: Even though y'all were playing the game?
"THE DEFENDANT: Right. When he called me a mother fucking son-of-a-bitch, that's it.
"SERGEANT MELTON: And he's on the chair?
"THE DEFENDANT: No. He was on the couch.
"SERGEANT MELTON: On the couch.
"SERGEANT KNIGHT: Why we asked, he was off the couch and his head was up against the chair when we saw him.
"THE DEFENDANT: He could
"SERGEANT KNIGHT: He could have fell off, or do you know how he got off?
"THE DEFENDANT: No. Because I run across the street after I done it and I recovered myself and called Mr. Griffin and made him call the police. I said I just killed Raymond.
"SERGEANT KNIGHT: Okay.
"SERGEANT MELTON: But Raymond wasn't doing anything but laying there and telling you to shoot him?
"THE DEFENDANT: He told me you chicken shit son-of-a-bitch if I didn't. He said I lost.
"SERGEANT MELTON: Okay. Have you and Raymond ever played this game before?
"THE DEFENDANT: Hey, there was about six of us that played it before. That's what you call roulette.
"SERGEANT KNIGHT: Russian roulette?
"THE DEFENDANT: Uh huh. Yeah. You pull the god damn trigger and see which one wins. One bullet in the god damn gun. Right?
"SERGEANT KNIGHT: Yeah. That's with a pistol. But this was with a shotgun.
"THE DEFENDANT: Yeah. But
"SERGEANT MELTON: Have you ever played this game with a shotgun before?
"THE DEFENDANT: No.
"SERGEANT MELTON: With Raymond?
"THE DEFENDANT: No.
"SERGEANT MELTON: But you have played Russian roulette with Raymond before?
"THE DEFENDANT: Yeah. But look here, he told mewe matched. If I'd have lost, he would kill me.
"SERGEANT KNIGHT: Do you think he would?
"THE DEFENDANT: Yeah. In a way. I don't believe he would. Now, I will put it that way. He come around again, and he said Willie, you're chicken shit son-of-a-bitch. When he said that, I just loaded [sic] the damn boom.
"SERGEANT KNIGHT: You wouldn't have shot him, if he hadn't of said that, then?
"THE DEFENDANT: No, sir.
"SERGEANT KNIGHT: Okay. That's all I know, that's it.
"THE DEFENDANT: Anything you ever(inaudible)
"SERGEANT MELTON: The only thing about it, you mentioned earlier that when you pulled that trigger, you messed up. You said that yourself. He messed up and you messed up.
"THE DEFENDANT: Yeah.
"SERGEANT MELTON: Is that right?
"THE DEFENDANT: I messed up. I know it.
"SERGEANT MELTON: So, you knew when you pulled that trigger you messed up, that it was wrong to do that?
"THE DEFENDANT: Now, I can't even face my wife, now over it.
"SERGEANT MELTON: Okay.
"THE DEFENDANT: Now, me matched to see which one was going to shoot which one. There was a shotgun sitting in the god damn corner.
"SERGEANT KNIGHT: And it's your shotgun?
*1000 "THE DEFENDANT: Yeah, it's my shotgun.
"SERGEANT KNIGHT: Okay.
"SERGEANT MELTON: Did you have any trouble with him earlier?
"THE DEFENDANT: Naw. huh-uh.
"SERGEANT MELTON: Had you had any trouble with anybody earlier today?
"THE DEFENDANT: Hey, I had trouble last night, now. Wait a minute, I got blood going down the alley, two god damn colored guys. I shot at them twice.
"SERGEANT MELTON: Naw. Trying to break in your garage. That's another time. We're talking about
"SERGEANT KNIGHT: Had you had trouble with Raymond today?
"THE DEFENDANT: No.
"SERGEANT KNIGHT: Or any time?
"THE DEFENDANT: No.
"SERGEANT KNIGHT: Did you have trouble with your wife?
"THE DEFENDANT: No.
"SERGEANT KNIGHT: Didn't have no trouble with your wife?
"THE DEFENDANT: Naw.
"SERGEANT KNIGHT: Is there anything else that happened that you want to tell me about?
"THE DEFENDANT: Not as I know of.
"SERGEANT KNIGHT: Huh?
"THE DEFENDANT: Not as I know of.
"SERGEANT KNIGHT: Okay. Has anybody threatened you or abused you to get you to talk to us?
"THE DEFENDANT: No. Not
(On the cassette tape it sounds like some type of motorized noise in the background where someone may have entered the interrogation room and turned on some piece of equipment. And in so happening, the Defendant paused several seconds and did not say anything.)
"SERGEANT KNIGHT: I said, did anybody threaten you or abuse you to get you to talk to us?
"SERGEANT MELTON: Hey, Charlie, excuse us.
"SERGEANT KNIGHT: He's out of the room, now.
"THE DEFENDANT: And you have taken everything I've said?
"SERGEANT KNIGHT: Yes, sir.
"THE DEFENDANT: Look here. Now, I've had a man to follow me for the last three days.
SERGEANT KNIGHT: No. I mean us. Has any police officer threatened you or abused you?
"THE DEFENDANT: No. There ain't no way. No.
"SERGEANT KNIGHT: Has this statement been made of your own free will?
"THE DEFENDANT: That's right.
"SERGEANT KNIGHT: Is it the truth?
"THE DEFENDANT: That's the truth, the wholestrike me dead.
"SERGEANT KNIGHT: This statement is going to be ended at 6:03."
We further find that the defendant's counsel was misinformed by the representations of state's counsel as to the contents of the recorded statement. The defendant said a great deal more than merely that he was guilty. The defendant had fired his shotgun at some black men the previous night, thinking they were trying to break into his garage. He referred to them as "god damn colored guys." He was seemingly indifferent to the fact that he had hit at least one of them and that there was "blood in the alley." All of these are seriously prejudicial facts when placed before a jury. The black jurors could only infer that the accused was prejudiced against blacks and that he had a reckless disregard for their lives. Could the remarks in the statement be eradicated by the able trial judge's immediate response of calling the black jurors to chambers and interrogating them on the effect of the evidence? What could be more prejudicial to a black juror than to have members of his ethnic group cursed by the defendant and to discover that the defendant, the night before the *1001 murder in question, fired at and wounded a black man, and was indifferent to having done so? Further, the statement held another surprise for the appellant's attorney, regarding appellant's reason for the shooting. At first, the appellant said the shooting was done to carry to a conclusion a bizarre game for two in which one player kills the other, roles determined by matching coins. Later in the statement, however, the accused seemed to be saying he had lost heart for the game, until the deceased goaded him to action by use of standard obscenities and profanity: "He said, now shoot. He said, you chicken shit son-of-a-bitch. When he said son-of-a-bitch, that's when he fucked up."
Rule 18, Temporary Rules of Criminal Procedure, states in pertinent part:
"Rule 18.1. Discovery by the Defendant
"(a) Statements of Defendant. Upon motion of the defendant the court shall order the district attorney:
"(1) To permit the defendant to inspect and copy any written or recorded statements made by the defendant to any law enforcement officer, official, or employee which are within the possession, custody, or control of the state, the existence of which is known to the district attorney; and
"(2) To disclose the substance of any oral statements made by the defendant before or after arrest to any law enforcement officer, official, or employee which the state intends to offer in evidence at the trial."
Rule 18.3, Temporary Rules of Criminal Procedure, imposes the affirmative duty on the parties to continue to disclose:
"Continuing Duty to Disclose. Subsequent to compliance with an order issued pursuant to Temporary Rule 18.1 or 18.2, and prior to or during trial, if a party discovers additional evidence or decides to use additional evidence, which information has been subject to discovery under this rule, that party shall promptly notify the court and the opposing party of the existence of the additional evidence to allow the court to modify its previous order for additional discovery or inspection."
The result in this case was poisoned by the actions of state counsel. It amounted to "justice by ambush," which we detest and which we here deplore. It is fundamentally unfair to conceal, or refuse to turn over to defense counsel, or to misrepresent the contents of, a copy of the accused's statement. It is unfair to induce opposing counsel to forgo a hearing and ruling on a motion to produce by entering into an agreement to produce and then to breach that agreement. The Supreme Court in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), wisely ruled that prosecutorial good faith was not a consideration in cases involving the withholding of exculpatory matters. We are of the opinion that prosecutorial good faith should not be considered in cases involving the withholding of discoverable material such as this. Fundamental fairness dictates that this case be reversed.
REVERSED AND REMANDED.
All the Judges concur.