The appellant, Steve Clifton, was convicted of capital murder and was sentenced to life imprisonment without the possibility of parole. Five issues are raised on appeal. Our review of these issues convinces us that Clifton's conviction should be not be reversed.
The evidence presented by the State tended to establish that on May 21, 1985, Deputy Bill Biles of the Morgan County Sheriff's Department was on duty. That day, he was assigned to patrol the Eva area of Morgan County. Around 8:28 a.m., Deputy Biles radioed a request for the tag registration on a vehicle with tag number 47U-3818. That afternoon at approximately 1:16 p.m., Deputy Biles notified Randy Earl Legg, the radio operator, that he was investigating a "suspicious vehicle," described as a blue Mustang, tag number 47U-3818 on Peck Hollow Road. Roughly four minutes later, Legg received another radio message from Biles requesting assistance and saying he had been shot. Legg immediately dispatched an ambulance to the scene, and, along with Sheriff Burgess, began dispatching officers to various areas of Morgan County in an attempt to locate the assailant. Other police departments in North Alabama were also advised of the incident.
The first person to arrive at the scene of the shooting was Rabon Thomas Dotson, a licensed emergency medical technician, who happened to be listening to his police radio scanner at home. After hearing on his scanner that a man had been shot in the area of Peck Hollow Road, he went to the area and found Deputy Biles lying in the road next to his patrol car. Biles was coherent and able to communicate, but was having difficulty breathing, so Dotson began to give medical assistance. While assisting Biles, he noticed a hole in Biles's shirt and a small amount of blood.
Moments later, Noodie Yates and Deputy Whisenant arrived at the scene almost simultaneously. Mr. Yates spoke to the victim and was recognized by him. Biles asked Yates to get his glasses, gun, and gunbelt, and keep them for him. Yates did so, but would later give these items to Captain Smallwood. Biles then gave Deputy Whisenant a description of his assailant, the car he was driving, and the direction in which he had fled the scene. Whisenant called in this information to the radio dispatcher, and then secured the area until additional investigating officers arrived.
Captain Roger Smallwood, the officer in charge of Biles's patrol shift that day, heard Deputy Biles's radio transmissions just before and after the shooting. He proceeded to the scene and found Dotson administering aid to Biles until ambulance personnel arrived and began treating the "suction wound" to Biles's chest. Captain Smallwood took custody of Biles's glasses, gunbelt, and service revolver from Yates, then escorted the ambulance to the Hartselle Medical Center.
Investigator Myra Yates of the Morgan County Sheriff's Department arrived at the Hartselle Medical Center shortly before 2:00 p.m. on May 21, 1985, and was met there by Captain Smallwood and Paul Cain, the former chief deputy of the Morgan County Sheriff's Department. Captain Smallwood turned over Biles's gunbelt and service revolver to her. Investigator Yates examined the weapon and noticed that it contained some spent rounds. She retained custody of Biles's gunbelt and service revolver until she turned it over to Captain Sherrill later that afternoon.
Paul Cain had also heard Deputy Biles's radio transmission that afternoon. He contacted his former employer, Sheriff Burgess, and asked if he could assist in any way. Sheriff Burgess asked him to go to the hospital and see if he could talk with Deputy Biles. Cain was allowed into the trauma room to talk with Biles while Doctors Duncan and Gay were treating him. Cain's conversation with Deputy Biles was interrupted several times because Cain had to leave the trauma room to phone in information *Page 175 
given to him by Biles which would assist others in apprehending the assailant.
Deputy Biles was coherent and able to recognize Cain. He reached up, grabbed Cain's hand, and with tears in his eyes, asked Cain to "please take care of Dot [his wife] and those kids." Cain stated that in his opinion Biles believed that he would soon die. Cain also testified that it appeared that Biles's pain became more severe as their conversation continued. However, Deputy Biles was able to give Cain a description of the vehicle that his assailant had been driving, including its tag number. He was also able to give a description of the assailant, describing him as a white male, approximately 20 years of age with dark hair and glasses, and wearing camouflage clothing. Biles also told Cain that after he had been shot he was able to return fire, but did not know how many shots he had fired from his service revolver. Biles recalled only one shot being fired by his assailant, and described the weapon as possibly being a 9 millimeter automatic weapon. Biles told Cain that he had stopped the Ford Mustang automobile and was approaching the driver's side to ask for the driver's identification when he saw the barrel of a gun "right between my glasses." He attempted to grab the barrel and push it toward the driver and away from his head. As he reached for the barrel, he heard a "click" but did not know if it was the safety or the hammer on the weapon. Just as he touched the barrel, he heard the weapon fire and felt his chest burn. After this conversation, Deputy Biles was taken from the trauma room to surgery. Following surgery, doctors appeared hopeful as to Deputy Biles's chances for survival. Some twelve to eighteen hours later, however, his condition began to worsen because of the shock suffered as a result of his gunshot wound. Deputy Biles's condition then rapidly deteriorated, and on the morning of May 23, 1985, he died, without ever regaining any significant degree of consciousness. The official cause of his death was listed as complications resulting from gunshot wounds, primarily a loss of blood.
While medical personnel were fighting to save Deputy Biles's life, law enforcement officials all over North Alabama were searching for his assailant. As a result of the information given to Paul Cain by Deputy Biles, a suspect was apprehended approximately an hour after the shooting. A couple who had been listening to their scanner notified Steve Hopson, a patrol deputy in Cullman County, that they had seen the blue Mustang being sought by law enforcement officials at Hebron Church. Hopson radioed for backup assistance, then proceeded to the church. Upon arrival, he observed a car and saw a white male standing beside the car. Moments later, a patrol unit from Blount County arrived on the scene. Together, the officers approached the vehicle and their suspect. Identifying themselves as deputies, the officers approached the suspect and repeatedly asked him to come out and lay his weapon down. Finally, officers saw the suspect throw something and acquiesce to the officers' request. The officers then placed the suspect, identified as the appellant Steve Clifton, under arrest and informed him of his Miranda rights. After Clifton was taken into custody, Deputy Hopson went over to see what he had thrown to the ground. Hopson found two rifle clips and one knife. At the time of his arrest, appellant was wearing camouflage clothing and glasses. Additionally, the tag number of the blue Mustang at the church was 47U-3818, and there were several bullet holes in the rear of the vehicle. Although the arresting officers could see several rounds of ammunition in plain view inside the Mustang, no one entered the car until Morgan County Deputy Sheriff Walter Glen Price arrived on the scene with a search warrant. A subsequent search of the Mustang revealed, among other things, a Colt AR-15 semi-automatic rifle; 284 rounds of 9 mm ammunition; 88 rounds of 223 caliber ammunition; and a camouflage jacket. No weapon chambering 9 mm cartridges was recovered. All of the items recovered at the scene of appellant's arrest were later turned over to Captain James Sherrill of the Morgan County Sheriff's Department, the chief investigator in the instant case. *Page 176 
At the time of appellant's arrest, Captain Sherrill was investigating the scene of the shooting. During the course of his investigation, he made numerous diagrams and measurements. Photographs of the scene were also taken. Additionally, four partial bullet fragments and one intact bullet, along with paint chips, were found in the roadway near Deputy Biles's patrol car. Captain Sherrill took custody of all the evidence collected at the scene of the shooting and then proceeded to the scene of appellant's arrest. He arrived at the arrest scene in time to supervise the search of appellant's vehicle. Captain Sherrill then took custody of all the evidence collected at the scene of the arrest. Captain Sherrill subsequently turned all of the evidence collected at both locations over to the State Department of Forensic Sciences for examination. Forensic experts subsequently determined that the paint fragments found at the scene of the shooting came from appellant's blue Mustang. The bullet and bullet fragments were determined to have been fired from Deputy Biles's service revolver. None of the recovered bullet fragments were found to have been fired from the rifle recovered from appellant's car.
Following appellant's arrest, he was taken to the Morgan County Sheriff's Department, where he was again informed of hisMiranda rights. Because appellant was a juvenile, he was also informed of the right to contact his parents. Appellant indicated to Investigator Thomas T. Taylor of the Alabama State Troopers that he wished to waive his constitutional rights, and he signed a waiver of those rights. He then made a statement to Investigator Taylor. Appellant's statement indicated that he was having personal and emotional problems just prior to the incident. He stated that he was parked on the road and a police officer came by, at which time he cocked the HK rifle which was positioned in his lap. He further stated that he was about to point the rifle and tell the police officer to back off. He said he held the muzzle out the window and was just about to say "back off" when he heard the officer say something about the gun, and that the officer then grabbed the muzzle and jerked it toward the rear of the car. Appellant indicated that he tried to push the officer away but that Biles would not let go of the gun. Appellant said he attempted to pull the weapon back into the car and, in doing so, squeezed the trigger, causing the weapon to fire a round. He said he then cranked his car and drove away, hearing gunshots behind him.
At trial, the appellant maintained that the shooting of Deputy Biles was accidental. Appellant stated that on the date in question, he was parked on the side of the road thinking about committing suicide when he was interrupted by Deputy Biles. Additionally, evidence concerning appellant's mental health was presented in an attempt to convince the jury that appellant was not guilty of Deputy Biles's murder because of mental disease or defect.
 I
Appellant first contends that the prosecution's failure to disclose certain evidence in the State's possession pursuant to the trial court's discovery order prejudiced his defense and denied him a fair and impartial trial. The evidence which was not disclosed by the prosecution consisted of photographs, experiments, statements of prosecution witnesses, certain radio logs, and sketches for trial. The State contends that this evidence was not discoverable under the trial court's order and that it acted in good faith in failing to disclose such information.
Discovery in a criminal case is governed primarily by Rule 18 of our Temporary Rules of Criminal Procedure. Rule 18.1, A.R.Crim.P.Temp., provides in pertinent part:
 "(c) Documents and Tangible Objects. Upon motion of the defendant the court shall order the district attorney to permit the defendant to analyze, inspect, and copy or photograph books, papers, documents, photographs, tangible objects, controlled substances, buildings or places, or portions of any of these things, which are within the possession, custody, or control of the state and: *Page 177 
 "(1) Which are material to the preparation of his defense; provided, however, the defendant shall not be permitted to discover or inspect reports, memoranda, witness lists, or other internal state documents made by the district attorney or his agents, or by law enforcement agents, in connection with the investigation or prosecution of the case, or statements made by state witnesses or prospective state witnesses;
 "(2) Which are intended for use by the state as evidence at the trial; or
 "(3) Which were obtained from or belongs [sic] to the defendant.
 "The court shall impose such conditions or qualifications as may be necessary to protect the chain of custody of evidence, or the attorney's, law enforcement officer's, or investigator's work product, or to prevent loss or destruction of such documents or objects.
 "(d) Reports of Examination and Tests. Upon motion of the defendant the court shall order the district attorney to permit the defendant to inspect and copy any results or reports of physical or mental examinations or scientific tests or experiments, if the examinations, tests, or experiments were made in connection with the particular case and the results or reports are within the possession, custody, or control of the state, and their existence is known to the district attorney."
Despite these provisions, a defendant has no inherent right to discovery of evidence in the State's possession.
 " '[T]he accused in a criminal case has no inherent right to the inspection or disclosure of evidence in the possession of the prosecution. Whether to grant or deny an accused the right to inspect evidence in the possession of the prosecution lies within the sound discretion of the trial court.' C. Gamble, McElroy's Alabama Evidence, § 290.05(1) (3d ed. 1977). See Killough
[v. State, 438 So.2d 311 (Ala.Cr.App. 1982)], supra."
Curry v. State, 502 So.2d 836, 841 (Ala.Cr.App. 1986). Therefore, we must look to the trial court's discovery order to determine what discovery rights were granted the appellant in this case.
An examination of the trial court's discovery order in the instant case reveals that the court followed the language of Rule 18 almost verbatim. Thus, we must now determine whether the appellant would be entitled to the aforementioned evidence under the provisions of Rule 18.1, A.R.Crim.P.Temp. Our review of the evidence not disclosed by the prosecution convinces us that the appellant would be entitled to only part of the evidence not disclosed, since Rule 18.1(c), A.R.Crim.P.Temp., states that an accused is not entitled to discover statements made by the State's witnesses or prospective witnesses. Neither would the appellant be entitled to discover any other documents prepared by law enforcement officials as part of the investigation or prosecution of the accused. Thus, the only discoverable material not disclosed by the prosecution would be photographs of the scene and the deceased and the results of the tests conducted by forensic experts on the victim's clothing.
The State argues that it did not have the results of these tests until almost nine months following the discovery conference. This does not excuse the State from disclosing the test results, as both the State and the defense were under a continuing duty to disclose, as required by Rule 18.3, A.R.Crim.P.Temp., which provides as follows:
"18.3. Continuing duty to disclose.
 Subsequent to compliance with an order issued pursuant to Temporary Rule 18.1 or 18.2, and prior to or during trial, if a party discovers additional evidence or decides to use additional evidence, which information has been subject to discovery under this rule, that party shall promptly notify the court and the opposing party of the existence of the additional evidence to allow the court to modify its previous order for additional discovery or inspection."
Neither does the apparent good faith of the prosecution excuse its failure to disclose evidence. "[P]rosecutorial good faith should not be considered in cases involving *Page 178 
the withholding of discoverable material such as this."Peal v. State, 491 So.2d 991, 1001 (Ala.Cr.App. 1985).
However, even though there was a violation of the court's discovery order, we do not find it necessary to reverse the appellant's conviction. Rule 18.5, A.R.Crim.P.Temp., gives a trial judge a number of options to consider in imposing sanctions on a party who has failed to comply with the court's discovery order. Rule 18.5(a) states as follows:
 "(a) Noncompliance. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; grant a continuance if requested by the aggrieved party; prohibit the party from introducing evidence not disclosed; or enter such other order as the court deems just under the circumstances."
The new trial sought by appellant is but one alternative available to a trial judge in the event of a party's noncompliance with a discovery order. Indeed, this issue was recently addressed by this court in McCrory v. State,505 So.2d 1272, 1279 (Ala.Cr.App. 1986), wherein we held:
 "The imposition of sanctions upon noncompliance with a court's discovery order is within the sound discretion of the court. United States v. Koopmans, 757 F.2d 901, 906 (7th Cir. 1985); United States v. Saitta, 443 F.2d 830, 831 (5th Cir. 1971); Hansen v. United States, 393 F.2d 763, 770 (8th Cir. 1968). Moreover, the trial court should not impose a sanction which is harsher than necessary to accomplish the goals of the discovery rules. United States v. Gee, 695 F.2d 1165, 1169 (9th Cir. 1983). Obviously, the trial court deemed a new trial too severe a sanction to impose on the State here, if indeed he found a violation of his discovery order. We cannot say that there was an abuse of discretion here. Gee, supra."
We disapprove of the tactics used by the prosecution in the instant case, which invite reversal of convictions. However, we find that, as in McCrory, a new trial is too severe a sanction to impose for noncompliance. None of the nondisclosed evidence was exculpatory and, thus, no Brady [v. Maryland, 373 U.S. 83,83 S.Ct. 1194, 10 L.Ed.2d 215 (D.Md. 1963),] analysis is required. Neither was the nondisclosure of any of this evidence prejudicial to the appellant's defense. The photographs not disclosed were merely pictures of the victim, the scene of the shooting, and the scene of the arrest. The tests conducted by forensic experts on the gun found at the arrest scene revealed that, when fired, the weapon would leave no powder residue on an object more than three feet from its muzzle. Forensic experts also tested the shirt worn by Deputy Biles at the time he was shot and found no powder residue on it. We find, as did the trial court, that these results are not inconsistent with the appellant's theory of defense, i.e., that it was an accidental shooting. It logically follows that in attempting to move the rifle away from his head, Deputy Biles was, at the same time, trying to distance himself from the muzzle of the weapon. Thus, his actions could well have caused the appellant to involuntarily discharge the weapon. The appellant's right to a fair and impartial trial was not substantially prejudiced by the nondisclosure of this evidence. The trial court did not abuse its discretion in refusing to exclude such evidence, and we hold, therefore, that the appellant is not entitled to a new trial because of the State's failure to fully comply with the trial court's discovery order.
 II
Appellant next contends that the trial court erred in allowing testimony concerning statements of the deceased into evidence as a dying declaration. Specifically, he argues that victim's statements were beyond the res gestae of the offense and that the State failed to lay a proper predicate for the admission of those statements as a dying declaration.
"Statements and declarations of a deceased are not competent evidence for or *Page 179 
against an accused in a murder prosecution unless made in his presence, or unless they are admitted in evidence as part of res gestae or constitute dying declarations." Hargrove v.State, 368 So.2d 335, 337 (Ala.Cr.App. 1979). A "dying declaration" is defined as follows:
 "A dying declaration is a statement by a person who believes that his death will certainly occur soon. He must be gripped by that despair of life which is naturally produced by an impression of almost dissolution, a dissolution so near as to cause all motives of falsehood to be superseded by the strongest inducements to strict accuracy. It has been said that the declarant, when making the statement, must have been in settled, hopeless expectation of impending death.
 "It must be emphasized, however, that it is not indispensable that the declarant should have said that he believed that he must or would soon die. Such belief may, in the circumstances of the case, be inferred from his condition, his conduct and the conduct or statements of those around him."
C. Gamble, McElroy's Alabama Evidence § 248.01(1) (3d ed. 1977).
In determining whether a statement qualifies as a dying declaration, the trial court must determine the state of the declarant's mind when the declarations were made. Voudrie v.State, 387 So.2d 248, 250-51 (Ala.Cr.App.), cert. denied,387 So.2d 256 (Ala. 1980). There is no set rule to determine the proper predicate for admission of a dying declaration, but, rather, each case must be considered on its merits by the trial judge; however, in determining the predicate, the trial court should consider statements of the declarant, the gravity and nature of his wounds, his physical condition, time between wounds and death, and all other facts tending to show the declarant's state of mind at the time the declarations were made. Bell v. State, 402 So.2d 1, 8 (Ala.Cr.App. 1981); Young v.State, 363 So.2d 1007, 1010 (Ala.Cr.App. 1978).
As was stated above, it is not necessary that the declarant state that he will soon die in order to have his statements considered a dying declaration. Neither does the fact that someone tells the declarant that he is not going to die render a dying declaration inadmissible. Voudrie v. State, supra, 387 So.2d at 251.
We find the instant case to be similar to the case ofCarson v. State, 439 So.2d 1350, 1352 (Ala.Cr.App. 1983), wherein we held that in light of the extent of the shooting victim's injuries at the time he made his statement to the police, his expressed realization of the severity of his condition, and the short time within which he died after making his statement, the victim was cognizant that his death was imminent and, thus, that his statement was admissible under the dying declaration exception to the hearsay rule. Here, just as in Carson, the victim, Deputy Biles, was interviewed in the hospital. Paul Cain, a former co-worker of Deputy Biles, testified that when he spoke with the victim in the hospital's trauma room, the victim, with tears in his eyes, asked Cain to take care of his wife and children. He then related to Cain information about his assailant, including a description of his car and its tag number. This information included the fact that Deputy Biles had encountered the same individual earlier that same day. During the time Cain was in the trauma room, Deputy Biles's condition rapidly deteriorated and shortly thereafter, he was taken to surgery. Following surgery, Deputy Biles's condition continued to worsen and he died without ever regaining any significant degree of consciousness. Based on the foregoing, we find that the trial judge correctly applied the law in allowing Deputy Biles's statements into evidence.
 III
Appellant further contends that the trial judge erred in his oral charge to the jury by improperly commenting on the evidence and, also, that he failed to adequately instruct the jury on the elements of capital murder and its lesser included offense of murder.
Our examination of the record in this case reveals that at the conclusion of the *Page 180 
court's oral charge, both sides announced that they had no objections to the court's oral charge. The only objections which appellant made regarding the court's refusal to give any of his written requested charges concerned the court's refusal to give several affirmative charges and one other charge which covered the elements of manslaughter, a charge that was subsequently covered by the court in its supplemental charge to the jury.
We have made it clear that the burden is on the appellant to timely advise a trial judge of his objections to the jury charge, stating his grounds, before the jury retires, because matters which are not objected to at the trial level cannot be considered for the first time on appeal. Cox v. State,500 So.2d 1296, 1299 (Ala.Cr.App. 1986). A specific ground of objection waives all other grounds of objection. Murray v.State, 494 So.2d 891, 893 (Ala.Cr.App. 1986); Blackmon v. State,449 So.2d 1264, 1266 (Ala.Cr.App. 1984). Therefore, since appellant made no objections to the court's oral charge to the jury, he has failed to preserve his objections to the court's charges concerning capital murder and its lesser included offense of murder. Thus, there is nothing before this court to review on this issue.
 IV
Appellant also contends that the trial court erred in submitting to the jury a verdict form for a finding of not guilty by reason of insanity, as previously provided for by Alabama law, rather than a verdict form for a finding of not guilty by reason of "mental disease or defect," as our new rule provides. Again, no objection was made regarding this matter at trial. Because no objection was made, nothing is preserved for our review. Bell v. State, 466 So.2d 167, 172
(Ala.Cr.App. 1985); Gunn v. State, 387 So.2d 280, 282
(Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala. 1980). Indeed, we have made it clear that matters not objected to at trial — including constitutional issues — cannot be considered for the first time on appeal. Certainly, the better practice is to follow the language of the new rule. In the instant case, however, we find that no reversible error occurred because of the trial court's failure to do so.
 V
Appellant last contends that the evidence adduced at trial was insufficient to support his conviction for capital murder. Specifically, Hinton contends that the State failed to present any direct evidence which linked him to the murder of Deputy Biles and that the State further failed to prove that he intentionally killed Deputy Biles.
 "A killing is not accidental when the act causing death is done intentionally. Lewis v. State, 96 Ala. 6, 10, 11 So. 259 (1891). Any contention that the death was accidental 'ignores the nature of the enterprise that the defendant . . . [was] engaged in.' Sanders v. State, 16 Ala. App. 511, 513, 79 So. 504 (1918)."
Toles v. State, 484 So.2d 512, 515 (Ala.Cr.App. 1985); Phelps v.State, 435 So.2d 158, 165 (Ala.Cr.App. 1983). Here, Deputy Biles's account of the shooting, as set out above, supplied evidence of the appellant's intent. Thus, we find that there was sufficient evidence from which the jury could infer the appellant's intent.
We further note that the mere fact that evidence is of a circumstantial nature does not make it deficient; circumstantial evidence is entitled to the same weight as direct evidence, provided it points to the guilt of the accused. Linzy v. State, 455 So.2d 260, 262 (Ala.Cr.App. 1984). The test of the sufficiency of circumstantial evidence is not whether the possibility exists that someone other than the accused committed the crime, but rather whether the evidence excluded every reasonable hypothesis but that of the accused's guilt. Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). Viewing the State's evidence presented to the jury, which is set out above, under the principles enunciated in Cumbo, supra, we find that, when viewed in the light most favorable to the prosecution, it was sufficient to allow the jury to find that the evidence excluded every reasonable hypothesis except that of the appellant's *Page 181 
guilt. The State's evidence established the following: While on duty, Deputy Biles called in that he was investigating a suspicious vehicle with license number 47U-3818. Moments later, he radioed in that he had been shot. When assistance arrived at the scene of the shooting, Deputy Biles was able to give officers a description of his assailant, the car he was driving, and the directions in which he had fled. He also told them that he had returned fire. Investigators collected paint fragments and bullet fragments at the scene. Shortly thereafter, law enforcement officials received information that a blue Mustang matching the description of the assailant's car had been spotted nearby. When officers arrived on the scene they found appellant beside the car Deputy Biles had described. There were bullet holes in the back portion of the car. Additionally, appellant fit Biles's description of the assailant. The weapon found in appellant's vehicle fit the description given by Deputy Biles to Paul Cain in a dying declaration. Expert analysis of the paint fragments found at the scene of the shooting determined them to have come from appellant's car. Moreover, appellant admitted to Investigator Taylor that he was the person who shot Deputy Biles, but that the shooting was an accident. Clearly, it was reasonable for the jury to find that the evidence was inconsistent with any reasonable theory of innocence. Indeed, all material circumstances in the evidence point to the appellant's guilt. Thus, we find that the evidence presented at trial was sufficient to sustain the appellant's conviction for capital murder.
The judgment of the trial court is, therefore, due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur.
 ON APPLICATION FOR REHEARING
TAYLOR, Presiding Judge.
We note that counsel on appeal was not trial counsel.
OPINION EXTENDED; AFFIRMED; RULE 39(k) MOTION DENIED; APPLICATION OVERRULED.
All the Judges concur.