This is an appeal from a judgment of conviction of common law robbery and a sentence to imprisonment for forty years.
An issue is raised as to the sufficiency vel non of the evidence to support the jury verdict, which issue we first consider. In doing so, we summarize the material evidence bearing upon the issue. The defendant did not testify, and no witness was called to testify on behalf of defendant.
According to an abundance of undisputed evidence, including the testimony of Yvette Moore Campbell and a number of other witnesses, there was a robbery on the morning of October 5, 1979, at the West Oxmoor Branch of City National Bank of Birmingham by three black males, all wearing ski masks, and who were all of the same general height and weight: 5'7" and 140-160 pounds. After one of them shot and caused to fall to the floor Jack Berdaux, a customer of the bank, the robbers demanded of the head teller and the other tellers all of the currency they had. They succeeded in obtaining from them the sum of $32,410.00, placed the money in some plastic bags and left the bank with the money. They then entered an automobile they had parked at the bank a few minutes before the robbery, left hurriedly in the automobile and proceeded westerly toward the Ishkooda-Spaulding Road.
The summary of the evidence thus far is sufficient, we think, to establish the corpus delicti of the crime. However, no witness was able to identify the defendant as one of the robbers. The State relies entirely upon circumstantial evidence to establish such identity. We now summarize the substantial undisputed circumstantial evidence as to whether defendant was one of the robbers.
Ms. Patricia Aaron testified that on the morning of October 5, 1979, she drove an automobile to the Shel-Al Building, which is almost adjacent to the West Oxmoor Branch of the City National Bank of Birmingham and as she was getting out of her automobile to go into the Shel-Al Building she noticed an automobile pulling "into the *Page 833 
little drive in front of the little foyer in front of the bank." She said three people were in the other automobile who "had on ski masks and had sweaters and gloves on and one of them had a gun." She testified further:
 "Q. At this time what did these people with the ski masks do?
 "A. The first one went inside the bank. The other two were kinda hesitant and then both went in.
"Q. Did you hear anything at this time?
 "A. Yes, sir. I had gotten out of my car by this time to go into the Shel-Al Building and I heard two shots.
"Q. Two shots?
"A. Yes.
"Q. What did you do then?
 "A. I went inside the building and went to the first office that was in the building and had them call the police.
 "Q. How long in your judgment were you inside the building?
"A. Two to three minutes at the very most.
"Q. Did you come back outside the building?
 "A. I came back to the foyer part of the building. It's glass.
 "Q. Approximately how far were you from City National Bank at that time, if you know?
"A. Maybe fifteen (15) feet.
 "Q. Did you see anything happening over at City National Bank when you came back out?
 "A. Yes, I did. The same three came back out and got in the car and drove away.
 "Q. When they came back out and got in the car did you notice in which direction they left in?
 "A. They were going toward where the cemetery was. Is it Ishkooda Road?
"Q. Toward Ishkooda Road?
"A. Right."
The witness described the automobile in which the three persons with ski masks were traveling, in accordance with what she "thought at that time," as a "late model Ford; blue." She further described it as being "dark blue with kind of a tan Landau roof and tan trim" that "ran down the side of the side of the car." She also said, "The car was clean and looked fairly new." Notwithstanding Ms. Aaron's description of the automobile of the robbers as a Ford, she testified that it was similar to the photographs of a Mercury Cougar depicted in State's Exhibits C and D.
Clifton Moore testified that on October 5, 1979, while he was waiting on his front porch for a ride to take him to work at 10:30 a.m., he heard an automobile coming down Ishkooda Road. The automobile turned the corner and drove to the side of the Mason City Baptist Church, where it stopped. His testimony continued:
"Q. Did anybody get out?
"A. Three people.
 "Q. Were they white males, white females, black males or black females?
 "A. Well, I really couldn't tell but they all looked like males. Black males.
"Q. What did they do when they got out of that car?
"A. They got into the Cadillac.
 "Q. Got into the Cadillac? The Cadillac means something to you, but what do you mean the Cadillac? Where was the Cadillac?
 "A. The Cadillac was parked on the side of the church. They pulled up in the other car. All of them jumped out. They grabbed the last one. He was pretty slow getting out. They got in the Cadillac and they cranked the Cadillac up.
 "Q. How close were you to those individuals at that time?
"A. About 50 to 60 yards away.
"Q. Could you identify any of them?
"A. I didn't get a real good look at them.
 "Q. Could you tell whether they had masks on their face or were their faces clean or what?
"A. It didn't look like they had masks on.
"Q. When they got in the Cadillac what happened? *Page 834 
 "A. They started the car and they pulled out and they come down the road.
"Q. In which direction did they go?
"A. From the church to the right.
 "Q. Was that back in the same direction they had come from?
"A. Opposite direction."
The witness testified that the automobile in which the three men were riding as they drove up to the churchyard was "an almost brown, but not quite brown" Cougar. The witness further testified that some time the same day after he had gone to work Sergeant Smith came to the place the witness was working and took the witness to see an automobile, which the witness identified as the Cougar automobile that the three men had driven to the churchyard and left in the yard. He was shown State's exhibits E, F, G and D, photographs of a Cougar, as to which he said, "That's the car." According to the witness, "about twelve days after the robbery" he went with Sergeant Smith and saw another automobile that he identified as the Cadillac automobile in which the three men left the Mason City Baptist Church. He testified that when the car stopped in which the three men were riding to the church on the morning of October 5, 1979:
 "Two got out of the car. One was carrying a clear plastic bag with green flowers on it. Another one was carrying a clear plastic bag with red flowers on it. One of the guys had a white sack under his arm."
Law enforcement authorities investigated the Mercury Cougar on October 5, 1979, soon after it was located in the churchyard. There was evidence that the Alabama tag on the automobile, number ASZ-954 was a replacement for a tag that was on the same automobile, as shown by the serial number or identification number of the mentioned Mercury Cougar, which was on the lot of Bart Starr on October 4, 1979, who then owned it.
Qualified personnel examined carefully on October 5, 1979, the interior and exterior of the Mercury Cougar, but they were unable to obtain any valuable fingerprints therefrom other than one fingerprint lifted from the back of the tag on the car, which Ms. Mary Anderson, a fingerprint technician with the Jefferson County Sheriff's Department, compared with a known fingerprint of the defendant after he had been arrested on October 22, 1979. She said, "They are one and the same."
There was evidence that a substantial amount of "bait money" was in the currency that was taken away from the bank by the robbers and that "bait money" serial number records were maintained by the bank. One record so maintained was of a ten-dollar bill numbered F-6-3-6-4-8-3-6-B. There was evidence that after defendant was arrested on October 22, 1979, and taken to jail a ten-dollar bill bearing the same serial number was found on or about his person.
The presence of a fingerprint of the defendant that had been lifted on October 5, 1979, from the back of the tag on the Mercury Cougar and defendant's possession on October 22, 1979, of a roll of currency that included one of the ten-dollar bills that had been taken from the bank on October 5, 1979, when considered with the undisputed evidence as a whole, constituted, in our opinion, substantial evidence of defendant's participation, as one of three men, in the alleged robbery. The verdict of the jury finding the defendant guilty is well supported by the evidence.
Appellant relies upon Ladd v. State, Ala. Cr.App.,363 So.2d 1017 (1978), in support of his contention that the establishment of a fingerprint of defendant on the back of the tag on the Mercury Cougar on October 5, 1979, was insufficient to show that defendant was one of the three men using the automobile that day in the perpetration of the robbery. In Laddv. State, it was held that the presence of latent fingerprints lifted from the inside of the rear view mirror of an automobile that had been stolen that matched defendant's patent fingerprints was insufficient to support a verdict finding him guilty of the purchase, receipt or concealment of the automobile. There are some similarities between Ladd, supra, and *Page 835 
the instant case; there are material dissimilarities. In the cited case, the automobile was recovered "on the side of a public road" where it had been abandoned with its motor burned out. It could not be reasonably said that defendant fingered the inside of the rear view mirror of the automobile at any definite time or times during the twenty-four day period between the theft and the recovery of the automobile. In the instant case, it can with reason be said that the back of the tag had been fingered by the person whose fingerprint was found thereon within less than twenty-four hours prior to the robbery of the bank, either before, after or while it replaced a tag on the automobile while it was owned by and in the lot of Bart Starr. In the absence of any evidence to the contrary, it can be reasonably concluded that there was criminal linkage between the person or persons who switched the tags on the automobile and one or more of the three persons who robbed the bank. Nevertheless, it is not necessary for us to conclude that the fact that defendant's fingerprint was found on the back of the tag soon after the robbery is in and of itself sufficient to uphold the jury's verdict. It is only one of two greatly significant circumstances pointing toward defendant's guilt, the other being the presence of one of the ten-dollar bills stolen from the bank on the person of the defendant at the time he was arrested. The infinitesimal chance that the coexistence of those two significant circumstances was merely coincidental forbids a reasonable reconciliation thereof with defendant's innocence.
One of appellant's contentions for a reversal is that the warrantless seizure of the mentioned ten-dollar bill "identified by serial number as bait money taken from the bank on October 5, 1979," was unreasonable, in that, according to appellant, "the money was seized (A) after all normal arrest and booking procedures took place, without having a proper search warrant, and (B) the location of and surrender of the money was gained by Sergeant Walker without giving the properMiranda warning prior to questioning the appellant."
As to the (A) part of appellant's contention as to the warrantless seizure of the ten-dollar bill that constituted a part of the "bait money," the transcript shows that at the time of defendant's arrest at his home on October 22, 1979, Sergeant Charles Trucks of the Birmingham Police Department had received information from a confidential, reliable informant whose prior information had been proved to be correct and had resulted in many convictions. According to the testimony of Sergeant Trucks on voir dire out of the presence of the jury, the gist of the information was:
 "That three black males, one being the defendant; one being Tony Williams; and another black male known only as Mike, had robbed two banks in the Birmingham area, one being the City National Bank on Oxmoor Road. Said informant gave me information with reference to the vehicle that was used, vehicles that were used on both bank robberies.
 "Q. Go on and tell us what information he gave you concerning the City National Bank about the vehicles?
 "A. He told me that the vehicle was a Mercury stolen from Bart Starr and he gave me the color of the vehicle.
"Q. What color did he give you?
 "A. Brown over dark blue or navy blue. It was stolen from Bart Starr out in the Irondale area. That the get-away-car was a blue over white Cadillac. That the Cadillac could be found in the 1300 block and I have to look at my notes to give you the exact address on that."
The transcript further shows that at the time Sergeant Trucks received the information from the confidential informant Sergeant Trucks was largely in charge of the investigation of the bank robbery and was cognizant of what the law enforcement authorities had learned about the robbers and their flight from the bank and the church where they exchanged automobiles. The witness was fully cognizant of the identity and description of the Mercury Cougar and of the established fact that the robbers exchanged it for a white Cadillac parked at *Page 836 
the church. The informant gave Sergeant Trucks some additional corroborative information. Promptly after receipt of the information from the confidential informant, Sergeant Trucks directed Officer Robert Walker to go to the defendant's address and arrest him, while Sergeant Trucks was in the process of going to the home of one of the other participants in the robbery, according to the information given Sergeant Trucks by the informant. In accordance with the direction given by Sergeant Trucks, Officer Walker proceeded to the home of defendant and arrested him. The evidence stated convinces us that Sergeant Trucks at that time had probable cause for directing the arrest of defendant and that there was probable cause for the arrest of the defendant by Officer Walker and Officer Mosley who accompanied him.
Notwithstanding some regrettable vagueness and ambiguity about the evidence as to the ten-dollar bill (State's Exhibit J) which bore the serial number of some of the "bait money" taken from the bank at the time of the robbery, we are unable to agree with appellant's contention that there was an unconstitutional seizure thereof by reason of the seizure being made "(A) after all normal arrest and booking procedures took place." The evidence shows that at the time appellant was arrested at his home he was searched by the officers who "observed and replaced some money in his pocket" and as appellant states in his brief, the "Appellant asked if he could give the money to his mother." The officer stated: "No, they would want it as evidence."
Appellant concedes that the search of defendant at the time of his arrest was valid, as held in Abel v. United States,362 U.S. 217, 239, 80 S.Ct. 683, 697, 4 L.Ed.2d 668, 683 (1960). The mentioned ten-dollar bill was not obtained by the officers until after the defendant had been taken to jail, searched by the warden and placed in a cell. During the course of his incarceration some currency was taken from him, or given by him to the warden or his assistants, and placed in the property room, but the appellant retained, without scrutiny by the authorities at the jail, some of the currency that he had with him at the time of his incarceration. It appears that while Officer Walker was in the process of arresting and transporting the defendant to jail, Sergeant Trucks was busily engaged in the apprehension and arrest of one of the other participants in the robbery, according to the informant. After Sergeant Trucks returned to the city hall subsequent to his mission in connection with the arrest of another participant in the robbery, he examined a sizeable amount of currency he had recovered on his mission, looking at serial numbers thereon to compare with the record of the serial numbers of the "bait money." Sometime after defendant was placed in a cell, Sergeant Trucks, as the officer in charge of the investigation, ordered Officer Walker to obtain appellant's money. Officer Walker found some of the money in the property room and then went to appellant's cell and questioned him about the rest of the money. Appellant told Officer Walker he had some money but that he had turned it over to another inmate. Officer Walker told the appellant to get it from that inmate, which he did, and handed it to Officer Walker. The money thus delivered to Officer Walker was found to contain the ten-dollar bill bearing the serial number of some of the "bait money."
During the cross-examination of Officer Walker as to his patting down defendant at the time of his arrest, finding a roll of currency in defendant's pocket but not taking possession of the roll or wad of currency, Officer Walker testified:
"Q. Why didn't you take the money?
"A. The procedure would be to take it at the jail.
"Q. Who to take it?
"A. The warden who books him in.
"Q. Did you stay there to watch the warden take it?
"A. No, I did not.
"Q. Why?
"A. Because I had other things I needed to do.
"Q. But then you came back to get it, right? *Page 837 
"A. That's correct.
"Q. Why didn't you just get it while you were there?
"A. Because my supervisor sent me back to pick it up.
 "Q. I know but why didn't you get it when you had it to start with?
 "A. Because I was gonna leave with the warden to take it up at the jail.
 "Q. But you had it in your hand at one time didn't you?
"A. That's correct, I believe.
 "Q. But then you are not saying that he pulled it out of his sock are you?
"A. No, I'm not.
"Q. Somebody else did?
"A. Mr. Juan White pulled it out of his socks.
"Q. He then handed it to Hall and handed it to you?
 "A. He handed it to Mr. Hall and Mr. Hall handed it to me."
In insisting that Officer Walker's action in obtaining currency from the defendant after defendant had been placed in a cell, and after the defendant had gone through the "traditional" procedure of being searched by the warden and after defendant had in some way turned over some currency to another inmate of the jail, constituted an unconstitutional seizure, appellant argues that such "search . . . cannot be sustained on good faith." Although we find some confusion, some uncertainty and some conflict in the evidence as to the time and sequence of events beginning with the arrest of the defendant and the location of a ten-dollar bill with the same serial number as a ten-dollar bill that was in the "bait money," we are unable to find any evidence of bad faith on the part of Officer Walker, Sergeant Trucks, the warden or any other person connected with the arrest and imprisonment of defendant. The failure of the warden and Officer Walker to become assured when defendant was being processed to be placed in a cell that the money on his person at the time was properly handled was by reason, according to the evidence, of pressure of other important matters to which Officer Walker had to attend that required his presence elsewhere while the defendant was being processed by the warden.
We also disagree with appellant's contention II (B) to the effect that there was an unconstitutional seizure of the ten-dollar bill identified as a part of the "bait money" because "the location of and surrender of the money was gained by Sergeant Walker without giving the proper Miranda warning prior to questioning the appellant." We do not look upon the incident as one involving a confession or incriminating statement, which must be voluntary, understandingly and intelligently made, and which, to be admissible in evidence, must meet all the requirements of Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It was an interrupted continuation of the processing of defendant from one who has been arrested for probable cause for a felony to one confined to jail. Although it was somewhat belated, it was still a part of that procedure. In some way, which is not clearly shown by the transcript, part of the money that defendant had on his person when he was checked in at the jail was left in the property room but some of it was still on his person as he entered his cell. In some way, which is not clearly shown by the evidence, Officer Walker became aware of some discrepancy, or the probability of some discrepancy, and proceeded to obtain the rest of the money which should have been obtained, or a record thereof made, at the time defendant was taken to his cell.
It is to be noted also that as defendant was being transported from his home to the jail by Officer Walker and another officer, he was fully apprised by one of them of all of his Constitutional rights relative to his right to remain silent and to have an attorney without expense to him if he so desired before answering any questions and that as of that time at least all of the requirements of Miranda, supra, had been met. The transcript shows that at the time of defendant's arrest Officer Walker made it known to him that he was arrested for a bank robbery. It can be assumed that defendant *Page 838 
knew that his possession of a roll or wad of currency might have some incriminating effect, but it cannot be assumed that he had any idea or suspicion that any of the money was "bait money" as to which there was a record of the serial number or numbers thereof. We note the same voluntariness and readiness to turn the money over to the authorities after he had been placed in his cell as there was at the time of his being brought to the jail and at the time of his arrest. Instead of construing his action in obtaining and delivering to Officer Walker the money containing the ten-dollar bill that constituted a part of the "bait money" as an involuntary confession or incriminating statement or action on his part, we look upon it as entirely free and voluntary, especially so in that it appears that he was naturally anxious to remove any stigma against him by reason of his retention of some of the money that would normally have been deposited at the property room or a record thereof made as having been left with him as a prisoner.
To what we have said we should add that we are convinced that the effect of defendant's being comprehensively apprised of his Constitutional rights as mandated by Miranda, supra, while being transported to the jail, continued until he gave Officer Walker the damaging ten-dollar bill of the "bait money." The governing principle is made clear by Judge Bowen in Jackson v.State, Ala.Cr.App., 387 So.2d 316, 317 (1980), as follows:
 "`Once the mandate of Miranda has been complied with at the threshold of questioning it is not necessary to repeat the warning at the beginning of each successive interview.' Gibson v. State, 347 So.2d 576, 582 (Ala.Cr.App. 1977). Here, there is not one single circumstance which would indicate that the warning should have been repeated. Love v. State, 372 So.2d 414 (Ala.Cr.App. 1979)."
The only remaining contention of appellant is based upon action of the court as shown by the following part of the transcript at the beginning of the trial:
 "MR. PARKER: We would object to Mr. McDonald[1]
being in the case and assign as grounds that he does not represent Yvette Moore or City National Bank and it would thereby be improper for a special prosecutor to appear without representing the victim or the victim's employer.
"THE COURT: Overrule. There was a customer shot?
"MR. McDONALD: Yes, sir. Jack Berdaux.
"THE COURT: You represent Mr. Berdaux?
"MR. McDONALD: Yes, sir.
 "MR. PARKER: As I understand it Mr. Berdaux is a witness listed on the indictment.
 "THE COURT: As far as I am concerned he was more a victim of the robbery than the cashier from whom the money was taken.
 "MR. PARKER: A witness is not entitled to have a special prosecutor. Also on the motion to produce . . ."
Appellant commences his argument of this contention, as follows:
 "The record in this cause fails to show that either the Honorable Earl C. Morgan, District Attorney for the Tenth Judicial Circuit of Alabama, or his deputy, the Honorable Harwell Davis, ever appointed Russell McDonald as a special prosecutor in the trial below."
Appellant further says, "Appellant's counsel has found nostatutory law in support of appointment of a special prosecutor by a circuit judge under the facts of the instant appeal. . . ."
In our opinion, the appearance by a qualified attorney, which Mr. McDonald is and was, does not require an appointment by any court, the District Attorney, or any of his assistants. Of course, the trial court *Page 839 
would have the right, for good cause, to refuse to permit an attorney to appear as a special prosecutor in any case, but no effort was made to show any cause why Mr. McDonald, a former assistant district attorney, employed by Mr. Berdaux who had been shot by one of the robbers, should not appear and actively engage in the trial, which he did.
 "The appearance of additional employed counsel to aid in the prosecution of criminal cases has always been recognized in this State as legitimate and proper. 6 Ala. Digest, page 511, Criminal Law, (key) 640." Oliver v. State, 234 Ala. 460, 464, 175 So. 305
(1937).
We repeat and apply what was stated by Judge Tyson in Langleyv. State, Ala.Cr. App., 383 So.2d 868, 872 (1980), cert. denied, 383 So.2d 873:
 "The law in Alabama is clear that a special prosecutor may appear as an assistant to the prosecution with the consent of the court. Handley v. State, 214 Ala. 172, 106 So. 692 (1925), and authorities therein cited. Moreover, such special prosecutor need not show the authority under which he is employed or acting. Handley v. State, supra."
The action of the trial court in not sustaining defendant's objection to the appearance of Mr. McDonald as special prosecutor was free of error.
We have searched the record in vain for any error prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.
[1] The transcript shows as appearances for the State:
 "Harwell Davis, Esquire Deputy District Attorney
 "Russell McDonald, Esquire Attorney at Law
 Birmingham, Alabama Special Prosecutor"