505 So.2d 1272 (1986)
Charles C. McCRORY
v.
STATE.
4 Div. 609.
Court of Criminal Appeals of Alabama.
December 9, 1986.
Rehearing Denied January 13, 1987.
Certiorari Denied April 24, 1987.
*1273 M.A. Marsal of Seale, Marsal & Seale, Mobile, and Larry Grissett, Opp, for appellant.
Charles A. Graddick, Atty. Gen., and J. Elizabeth Kellum, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 86-577.
TYSON, Judge.
Charles C. McCrory was indicted for the intentional murder of his wife, Julie Bonds McCrory, in violation of § 13A-6-2, Code of Alabama 1975. The appellant was found guilty and sentenced to life imprisonment in the penitentiary.
C.H. McCrory, the appellant's father, testified that he went to the residence of his son and the victim at 8:25 on the morning of May 31, 1985. When McCrory entered the front door, he found the victim's body lying just inside the door. McCrory found his grandson, the child of the appellant and the victim, alive and well in his bedroom. The appellant arrived at the house five or ten minutes later.
Gloria Wiggins testified that she and the appellant began having an affair during the summer of 1984. The affair lasted until March or April of 1985. A letter written by Wiggins to the appellant and several letters written by the appellant to Wiggins were admitted into evidence.
After the affair ended, Wiggins and the appellant continued talking several times a day until the victim's death on May 31, 1985. Wiggins stated that the day before the victim's body was found, she talked to the appellant three times on the telephone. Their last conversation took place around 10:30 or 11:00 that night.
The next morning, the appellant called Wiggins at 7:00. She talked to the appellant at 10:30 that night and he did not seem upset.
Jeff Holland, a member of the rescue squad of the Andalusia Fire Department, received a call at 8:15 a.m. on May 31, 1985 concerning a problem at or near the appellant's house. While he was en route to the scene, the appellant contacted Holland on the radio and asked about the call. When *1274 the appellant was informed about the call, he told Holland he would help.
The appellant was at the scene when Holland arrived. He informed Holland that the victim was dead. Holland then called the police and checked for any signs of forced entry into the house. He could find none.
Billy Frank Treadway, an investigator with the Andalusia Police Department, arrived at the scene at 8:30 a.m. The appellant was already there. After securing the scene, Treadaway contacted Charlie Brooks with the Department of Forensic Sciences.
Treadway talked with the appellant that morning. The appellant said that he and the victim had been having marital problems. The two were separated and the appellant was living in an apartment while the victim remained in their house.
The appellant stated that he had been with the victim at their house the previous night and that they had engaged in sexual intercourse. He last saw the victim at 10:15 that night when he left.
The appellant told Treadway that he did not think his wife had a boyfriend and did not know who would kill her. He stated that the victim would not have let anyone in the house. The only persons with a key to the house were his parents and himself.
Treadway testified that the appellant's parents told him they did not have a key to the house. He found no signs of forced entry. No weapon was ever found.
On the day the victim's body was found, the appellant asked Treadway, "did the lick on the back of her head kill her?" (R. 84) Treadway stated he could not tell from looking at the victim's body that she had an injury to the back of her head.
Wade Garrett, an investigator with the Andalusia Police Department, dusted the scene for fingerprints. All of the prints lifted were either the victim's or the appellant's prints.
Garrett obtained a written statement from the appellant. His statement is as follows:
"A `6/2/85; Thursday morning I got up about 6:45 A.M. and showered and got dressed. Left for work at AEC at about 7:25. After getting to work I went into the office and began talking to Mike'I believe it's Cauly,'one of my employees. Julie called at about 8:00 to bring me a notebook of external degree info and a copy of a new book `A Passion for Excellence.' I had asked her to stop by and drop them off on her way to work. We talked briefly and I said that I didn't have time to stop by Hardee's and get some breakfast. She said she would go back to Hardee's and get it for me. She left and returned a few minutes later with some breakfast and then she went on to work at Triple H Specialty Co. I went about my usual work routine, paperwork. Met with two representatives from Data'I can't make the next word out. Data something, etc. 'About nine or 9:30 my left contact lens began giving me some trouble, irritation, etc. I called and got an appointment at 11:45 with Dr. Davidson to look at it. I left about 11:40 and went to his office, he looked at my eye and gave me a new lens. I went and got some lunch and returned to work. Julie and I had an appointment with a counselor at the Mental Health Center at 5:00. I left the office just before five and went there. I met with Ms. Ellen Williams for approximately an hour. When I came out Julie was waiting in the lobby to see her also. I spoke briefly with Julie and she went back to see Ms. Williams. I spoke to Judy Kelly who was also in the office a couple of minutes and left. I went back to Julie's, 300 Lori Lane, and sat down, turned on the TV. Julie arrived about ten or fifteen minutes later. She came and we talked about what Ms. Williams had said, the day's happenings at work, etc. Ms. Williams had given us both a copy of a personal profile to do. We discussed it and I told her I would fill it out and she could take them back Friday sometime.
"The old contact lens had irritated my eye and I had a headache. I called Julie to go and get Chad from mother's'
"MR. F. TIPLER: That's I asked Julie. 'I asked Julie to go and get Chad from *1275 mother's and I would go to the apartment and get a nap. We both left together somewhere around 7:00 or 7:15. After getting to the apartment I had to wash some clothes. I went back to the Jr. Food Store and got some quarters and returned to the apartment. I decided to call Julie at mother's and ask her if she would help me with them. She said she would just stop and pick them up and wash them while I got a nap. Chad and Julie stopped by about five minutes later, picked up the clothes, talked with Chad and they left. I got a nap, woke up and went back to Julie's about 9:00. I came in and we sat in the den and watched the first half of Hill Street Blues. We left Chad playing in the den and went to the bedroom about 9:30. We made love for approximately twenty-five to thirty minutes, talked, etc. Just after 10:00 we went back to the den with Chad, watched a minute or two of the news and went into the laundry to fold my clothes she had washed. About 10:20 or so we finished with the clothes. I took them out to the truck and came back in. I stood close to the door and kissed and hugged Julie and Chad goodnight. I backed into the street and honked the horn at them. Chad and Julie were at the front door, both waved goodbye. I left and went back to the apartment. I took my clothes, put them up, read the Opp News about 11:00. I called Gloria Wiggins in Opp. We talked for about thirty to forty-five minutes. I got up and went to sleep.'
"MR. F. TIPLER: I believe that word is I hung up.
"'hung up and went to sleep.
"I woke up Friday at 6:45, showered, got dressed and went to work. I got to work right at 7:30 and didn't have time to get any breakfast. I called Julie at home to ask her if she would stop and bring me some on her way to work. There was no answer so I redialed to be sure I didn't call the wrong number.
"There was still no answer. I worked on the MMPI test a few minutes and called mother's to see if she had dropped off Chad yet. Mother said she hadn't got here yet. I called Triple H and she wasn't at work either. I called the house again and still no answer. Mother called me and said that Daddy was going to check on her. I told her I would be on my way over there. I left the office and went to the house. On the way I heard on my radio the rescue squad say that they were 10-84 to my house. I called and told them I was also. I pulled in the front yard and started in the house. Daddy came out of the Whitaker's house across the street and said something has happened to Julie. I asked about Chad and he said he was at the Whitakers. I walked in the front door and saw her laying on the floor. I walked over and looked at her and went back outside. The rescue squad arrived and I walked back in, looked at her and walked to the bedroom looking around the house. I returned to the front and walked back outside.' There is a word I can't make out. On the squadI think it's `someone on the squad said they would call the police. Daddy was in the front yard and I talked to him trying to calm him down some. About that time the police arrived. Charles McCrory.'" (R. 159-62)
Wayne Meeks testified that he was staying with his grandparents during the week of May 31, 1985. Their residence is located in front of the victim's house. At 5:00 a.m. on the morning of May 31, Meeks went out to the garden at his grandparents' house. He saw the appellant's Bronco parked at the victim's house. The Bronco was still there when Meeks left for work at 5:15 a.m. Before he left, Meeks made a comment to his grandfather about the appellant's Bronco being at the house because there were rumors that the appellant and the victim were separated.
Hubert Walker, Meeks's grandfather, testified that he saw the appellant's Bronco at the victim's house on the morning of May 31, 1985. He heard the Bronco leave at 5:30 a.m.
Walker also stated that he had seen the appellant's Bronco at the victim's house the night before. It left around 10:30 p.m.
*1276 Ellen Williams testified that she is a marriage counselor and that she interviewed the appellant on May 30, 1985. She stated that the appellant told her that he married the victim out of habit. The appellant said that, although their sex life was good, he and the victim did not communicate. Williams and the appellant also discussed Gloria Wiggins.
Joshua Sapala, a forensic pathologist, performed the autopsy on the victim. His examination revealed four chop wounds to the back of the head, one chop wound to the side of the head, blunt trauma to the left part of the skull, eleven puncture wounds to the left breast, fractures of both mandibles, bruises to the right shoulder, face and ribs, and two bite marks in the right deltoid muscle area. Sapala concluded the victim died as a result of the chop wounds to the head, a depressed skull fracture and the puncture wounds to the left lung and pulmonary artery. He stated that the injuries to the victim's head occurred prior to the puncture wounds to the chest.
Dr. William King, a dentist, testified that he took teeth impressions of the appellant. Dr. Allen Stilwell, a medical examiner for the State of Alabama, obtained the appellant's dental impressions and sent them along with photographs of the bite marks on the victim's right deltoid muscle area to Dr. Richard Souviron, a dentist who specializes in forensic odontology.
Dr. Souviron testified that he received upper and lower dental models of the appellant's teeth and black and white photos which depicted bite marks to the deltoid area of the victim's right arm. Upon his examination of the dental impressions and the photos, he felt that the bite marks on the victim matched the appellant's upper teeth. Dr. Souviron sent a report of his findings to the district attorney's office.
Later, Dr. Souviron requested the original negatives of the bite marks. Based on the examination of this evidence, Dr. Souviron concluded that the bite marks on the victim were consistent with the teeth impressions of this appellant. He stated that the teeth marks were made at or about the time of death.
Charles Brooks, an employee of the Department of Forensic Sciences, testified that he went to the scene on the morning of May 31, 1985. He found the body of the victim lying just inside the house. A stocking was tied to the victim's right wrist and hair was found in her left hand. The hair was later determined to be consistent with the victim's own hair.
Brooks testified that, while he was there, the appellant asked him if the victim was killed by the blow to the back of her head. Brooks stated that you would not notice a blow to the back of the victim's head unless the victim's hair was pulled up.
When Brooks first examined the victim's body, he stated rigor mortis had not yet formed. This usually occurs from three to six hours after death. Brooks estimated the victim's death occurred after midnight and towards the early morning hours.
The defense presented several witnesses. James Whitaker testified that he lives across the street from the victim's house. Whitaker got up at 5:00 a.m. on the morning in question and went outside at 5:30 a.m. to get the paper. The appellant's Bronco was not parked at the victim's house.
Shannon Wiggins testified that he was employed by Bullard Excavating on the morning of May 31, 1985. Bullard Excavating is located adjacent to the victim's house. Wiggins stated he arrived at Bullard Excavating at 3:30 a.m. and stayed there until 4:00 a.m. He did not notice the victim's house but he thought the lights were on. Wiggins said he did not see the appellant's Bronco at the house but admitted it "could have been" there.
The victim's two brothers testified about a gun that belonged to the appellant which was never found in the house.
The appellant's testimony was similar to the statement he gave the police. He denied killing the victim.

I
On July 24, 1985, the appellant filed a motion to produce with the trial court, requesting, among other things:

*1277 "3. The results of all reports, including toxicology, medical, dental, psycological or psychiatric reports made in connection with this case and copies of all such reports." (R. 13)
On July 31, 1985, the court ordered,
"... that the State shall produce for inspection, and copying where applicable, and shall disclose those items which are subject to discovery under the provisions of Rule 18.1 of the Alabama Temporary Rules of Criminal Procedure." (R. 17)
The court further stated that the State was required to comply with the order of the court on or before August 9, 1985.
On August 8, 1985, the State, in its answer to the appellant's motion to produce, stated that: "A copy of the dental report... will be forthcoming upon receipt of same by the District Attorney's Office." (Supplemental Transcript, p. 3).
On August 21, 1985, the appellant filed a motion with the trial court asking the court to compel the State to produce, among other things: "(b) The results of all analysis and scientific tests of the bite marks alleged to be on the body of Julie McCrory." (R. 25)
That same day the trial court ordered the State to furnish to the appellant "any scientific report received by the State from the forensic dental pathologist," at least three weeks before trial. (R. 27)
Subsequently, the State furnished the appellant with a copy of a letter from Dr. Souviron to Dr. Stilwell, dated August 14, 1985. This letter reads as follows:
"Dear Dr. Stilwell:
"In phone conversation with you on August 1, 1985, I was asked to review some evidence regarding a possible bite mark on a homicide victim, medical examiner case number 85-36197, a Julie Ann McCrory. You stated that there appeared, in your opinion, to be teeth marks on the deltoid area of the right arm. You further stated that a suspect, her husband, had voluntarily consented to provide dental casts of his teeth. I received by registered mail on August 7, 1985, from the Alabama Department of Forensic Sciences in Montgomery, a set of dental casts and wax bite records taken by William G. King Jr. These models are yellow dental stone and are a maxillary and mandibular arches. The quality of the models is excellent. I received, in addition, a copy of the autopsy report and twenty-eight black and white photographs of the victim and various wounds on the victims body.
"In analyzing the twenty-eight photographs there is one photograph that was sent to me that would be of value in making an actual one to one comparison with the models of Mr. McCrory. The other photographs will be of evidentiary value, however, the negatives will be necessary in order to secure exact one to one photographs with the proper density and proper lighting. The photograph marked number one was the photograph that I used for my initial and preliminary examination. The photograph has a ruler and shows the deltoid area at the right angles to the film plane with a penny to the right of the two marks. The two marks as shown do not penetrate through the epidermaldermis layer. They are two different lengths. The larger of the two marks is approximately six millimeters, there is a gap between the larger and the smaller mark of approximately seven millimeters and the smaller mark measures approximately four millimeters. These two marks were consistent with teeth, they would be consistent with upper teeth."
"The models as presented show an unusual phenomena in that the upper left lateral incisor is missing and there is approximately a seven millimeter space between the distal of the upper left central incisor and the cutting edge of the upper left cuspid. This phenomena does not exist on the right side of his mouth. I conclude that the marks in the arm could have been made by the teeth of Mr. Charles C. McCrory.
"I would also like to point out several other features. First of all, it is impossible in my opinion, unless very unusual circumstances exists [sic] to make a positive identification from two teeth of a *1278 bite mark. Regardless of how unusual the two teeth happen to be. Further, there is no other teeth [sic] that I can see making a mark. For instance, lower teeth usually are the teeth in an actual bite that would grab and hold. These teeth (the lowers) do not show in any of the photographs that I have examined. Additionally, the upper right central, lateral and cuspid teeth do not mark on the photographs as I observe them. Additionally from a defense point of view there are numerous small puncture wounds on the left chest area, the right axilla, etc. A case could be made that these puncture wounds were made with the same instrument that made the mark on the deltoid area of the right arm. My final conclusion and opinion, if there is substantial amount of additional evidence such as finger prints, blood, hair, semen, etc., that would work in conjunction with these two marks, then I feel it would be of some value. However, if these two marks, which I believe are made by upper teeth, are the sole means of identification of the perpetrator, I feel that this is not in the best interest of justice. "If you wish to discuss the case further or you wish to pursue additional studies, I would be happy to discuss it with you in detail." (R. 86-87)
At trial, Dr. Souviron testified that after his letter to Dr. Stilwell on August 14, he requested and received negatives of the photographs which had been the basis for his conclusions in his letter dated August 14, 1985. After reviewing these negatives, Dr. Souviron concluded that the bite marks shown in the negatives were consistent with the teeth marks of this appellant.
After trial, the appellant filed a motion for new trial. In his motion, the appellant asserted that Dr. Souviron's conclusions, following his review of the negatives, constituted an additional scientific report which should have been disclosed to the defense according to Rule 18.3, A.Temp.R. Crim.P. This rule provides that:
"Subsequent to compliance with an order issued pursuant to Temporary Rule 18.1 or 18.2, and prior to or during trial, if a party discovers additional evidence or decides to use additional evidence, which information has been subject to discovery under this rule, that party shall promptly notify the court and the opposing party of the existence of the additional evidence to allow the court to modify its previous order for additional discovery or inspection."
The appellant contends on appeal that he was denied due process because the State failed to disclose Dr. Souviron's further conclusions and, thus, his motion for new trial should have been granted. We disagree.
This court is not prepared to say that Dr. Souviron's conclusions, after his review of the negatives, constituted additional evidence which would require disclosure under Rule 18.3.
At the hearing on the appellant's motion, the district attorney testified that he never received another report, oral or written, from Dr. Souviron after the letter of August 14, 1985. Thus, it was impossible for the State to disclose something it did not have. United States v. Barrett, 766 F.2d 609, 618 (1st Cir.1985).
Furthermore, Dr. Souviron's conclusion, after reviewing the negatives, did not significantly differ from his initial report. His conclusions were merely corroboration of his earlier findings.
Even had we determined there was some violation of the court's discovery order, there is still no ground for reversal for two reasons.
First, the remedy sought by the appellant is a new trial. Rule 18.5, A.Temp.R. Crim.P. gives a trial judge a range of alternative sanctions which may be imposed in the event of noncompliance with the court's discovery order. Rule 18.5(a) states:
"NONCOMPLIANCE. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; grant a continuance if requested by the *1279 aggrieved party; prohibit the party from introducing evidence not disclosed; or enter such other order as the court deems just under the circumstances."
Thus, upon hearing the testimony of Dr. Souviron regarding his additional conclusions, the appellant could have requested a continuance or a recess or moved to strike Dr. Souviron's testimony. Not only did the appellant fail to request any of these types of relief but he also failed to object to Dr. Souviron's testimony.
The imposition of sanctions upon noncompliance with a court's discovery order is within the sound discretion of the court. United States v. Koopmans, 757 F.2d 901, 906 (7th Cir.1985); United States v. Saitta, 443 F.2d 830, 831 (5th Cir.1971); Hansen v. United States, 393 F.2d 763, 770 (8th Cir.1968). Moreover, the trial court should not impose a sanction which is harsher than necessary to accomplish the goals of the discovery rules. United States v. Gee, 695 F.2d 1165, 1169 (9th Cir.1983). Obviously, the trial court deemed a new trial too severe a sanction to impose on the State here, if indeed he found a violation of his discovery order. We cannot say that there was an abuse of discretion here. Gee, supra.
Secondly, the appellant was not prejudiced by the State's failure to inform him of Dr. Souviron's further conclusions. The appellant could not have been surprised by his testimony concerning the later findings since it was merely corroborative of his initial report of August 14, 1985. United States v. Adams, 759 F.2d 1099 (3rd Cir.1985). The gist of Dr. Souviron's later conclusions, after his review of the negatives, was revealed to the appellant in the letter of August 14, 1985.
Furthermore, the appellant was provided with Dr. Souviron's address and telephone number. Certainly, the appellant had the opportunity to contact Dr. Souviron in order to get any clarification of Dr. Souviron's initial report, had he so chosen. The appellant was given an opportunity to thoroughly cross-examine Dr. Souviron at trial. Thus, we fail to see how the appellant was prejudiced in this instance.

II
The following statement was made by the trial judge prior to the trial of this case:
"THE COURT: Let the record show that Mr. Tipler has been employed by the family of the deceased person. That he is a member in good standing of the bar and practiced here for many years and the family is exercising their right to employ an assistant of the court, and the court gives him permission to appear." (R. 2a)
The appellant complains on appeal that he was deprived of a fair trial because a special prosecutor was employed by the victim's family to assist the district attorney in the prosecution of this appeal.
This contention is without merit. "The law in Alabama is clear that a special prosecutor may appear as an assistant to the prosecution with the consent of the court. Handley v. State, 214 Ala. 172, 106 So. 692 (1925), and authorities therein cited." Hall v. State, 411 So.2d 831, 839 (Ala.Cr.App. 1981)., cert. denied, 411 So.2d 831 (Ala. 1982) (quoting Langley v. State, 383 So.2d 868 (Ala.Cr.App.), cert. denied, 383 So.2d 873 (Ala.1980)).

"In McCain v. City of Montgomery, 38 Ala.App. 568, 92 So.2d 678, cert. denied, 265 Ala. 551, 92 So.2d 682, we find:
"`A defendant in a criminal prosecution is entitled to a fair and impartial trial, and nothing more. So long as the conduct of the special prosecutor comports to due and orderly procedure a defendant is in no position to complain as to who conducts the prosecution. Jones v. State, 16 Ala.App. 154, 75 So. 830. Certainly, as here, where special counsel acted with the consent of the regular prosecutor, and with permission of the court, no abuse of the discretion vested in the trial court in such matters is present. See also 42 Am.Jur., Prosecuting Attorneys, Section 10.'

"In Johnson v. State, 13 Ala.App. 140, 69 So. 396, cert. denied Ex parte State, 193 Ala. 682, 69 So. 1020, we find:

*1280 "`The control of the prosecution in so far as presenting the state's case is concerned, was in the hands of the solicitor, upon whom the statute imposes the duty of representing the state in the prosecution. Code 1907, § 7781. There is nothing in the statute or the policy of the state as expressed therein which denies the solicitor the right to accept assistance from a duly licensed practicing attorney, who is a sworn officer of the court. The acceptance of such assistance in a prosecution where he is not disqualified is entirely a matter within the discretion of the solicitor. It is certainly not a matter in which the defendant has any voice. And the fact that the attorney was employed by those interested in the prosecution is wholly immaterial. Shelton v. State, 1 Stew. & P. (Ala.) 208; 12 Cyc. 532; State v. Kent, 4 N.D. 577, 62 N.W. 631, 27 L.R.A. 686.'
"See also Handley v. State, 214 Ala. 172, 106 So. 692 (1926); Oliver v. State, 234 Ala. 460, 175 So. 305 (1937); and Owens v. State, 40 Ala.App. 36, 109 So.2d 141, affirmed on cert., 268 Ala. 506, 109 So.2d 144."
Brooks v. State, 45 Ala.App. 196, 200-01, 228 So.2d 24 (1969).
We find no error here.

III
The appellant challenges the sufficiency of the evidence. We have set out the facts involved in this case and need not restate them here. When the evidence presented at trial is viewed in the light most favorable to the State, it is clear that there was sufficient evidence to support the appellant's conviction for murder. There was sufficient evidence presented by the State to allow the jury to infer the appellant's guilt beyond a reasonable doubt. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979).
The judgment of the trial court is due to be, and is hereby, affirmed.
AFFIRMED.
TAYLOR, J., concurs.
PATTERSON, J., concurs in result.
BOWEN, P.J., concurs in result and files opinion in which McMILLAN, J., joins.
BOWEN, Presiding Judge, concurring in result.
I concur only in the result reached by the majority in Issue I.
Dr. Souviron's trial testimony differed significantly from the opinion he expressed in his pretrial letter of August 14th. His conclusion after reviewing the negatives did not have to conflict with his initial report in order to be "significantly different." The distinction between the import and meaning of the two opinions was of such importance that, once the State learned of the doctor's findings after reviewing the negatives, it was required to report them to the defense under Rule 18.3, A.R.Cr.P.Temp. Under that rule, a party has a continuing duty to disclose even if the "additional evidence" is not written.
However, since there was no objection at trial, the judge was never given the opportunity to fashion a remedy for noncompliance under Rule 18.5, A.R.Cr.P.Temp. The objection, raised only in the motion for new trial, came too late. "The grounds urged for a new trial must ordinarily be preserved at trial by timely and sufficient objections." Smith v. State, 393 So.2d 529, 532 (Ala.Cr.App.1981). Compare Young v. State, 494 So.2d 862 (Ala.Cr.App.1986) (objection to non-disclosure of nontape-recorded portion of defendant's statement to police overruled; only fair remedy was reversal and new trial).