TYSON, Judge.
John Michael South was indicted in a two-count indictment. He was charged with rape in the first degree, in violation of § 13A-6-61, Code of Alabama 1975, and assault in the first degree, in violation of § 13A-6-20, Code of Alabama 1975. This appellant was tried on June 29, 1987, and . found “guilty as charged in the indictment” of rape in the first degree, in violation of § 13A-6-61, Code of Alabama 1975. The appellant was sentenced to 99 years’ imprisonment in a state penitentiary.
I
This appellant contends that his judgment of conviction is based solely upon circumstantial evidence and not to the exclusion of any other reasonable hypotheses; therefore, this judgment should be reversed.
J.G., the victim in this cause, was assaulted and raped on January 28, 1987, shortly after her husband left for work at approximately 10:00 p.m. Earlier that evening Vicki and Boyd Reding had supper with the victim and her husband. The victim’s brother, Donald Collier, also stopped at the victim’s home on the night of the rape. Donald Collier left the home shortly after eating dinner and the Redings departed at approximately 9:00 p.m. The victim’s other brother, David Collier, also stopped by to see if the victim’s husband, Darrell, needed a ride to the plant. The victim’s husband declined the ride and left for the plant at approximately 10:00 p.m. The victim’s husband was scheduled to work the “midnight shift” that night.
The victim locked the doors after her husband left for work, and then she began reading in the living room. The victim went to the kitchen to get something to *730 drink and was confronted by a man. The man grabbed her and began beating her with a stick. The victim tried to escape, but she was overpowered. She was hit on the face, head, neck, back, and was eventually knocked unconscious and fell to the floor. The victim regained consciousness and the assailant continued to strike her, and she attempted to run to the kitchen. The victim was again knocked to the floor. The assailant dragged the victim to the dining room where he removed all of her clothing. At this time, the victim noticed that the man was wearing a large shiny belt buckle. The victim was again knocked unconscious and the assailant then dragged her down the hallway to the bedroom. The victim regained consciousness while being dragged down the hallway. Again she attempted to struggle free, but the assailant struck her with the stick with such force that it splintered. At this point, she could no longer resist.
The assailant dragged the victim into the master bedroom and threw her onto the bed. He then said to her, “You’re going to like it,” and unfastened his pants. (R. 72) There were no lights turned on in the bedroom, but a security light illuminated the bedroom. The assailant placed a pillow underneath the victim and then raped her. After he ejaculated, he said, “Don’t worry, I didn’t get you pregnant.” (R. 73) The assailant then refastened his pants and dragged the victim off the bed and down the hallway towards the dining room. The victim was lying on her stomach, and the assailant spanked her two'' or three times saying, “Now you be good now, and don’t move.” (R. 75) The assailant then unlocked the sliding glass door and fled.
Immediately prior to the attack, the victim did not hear a vehicle approach the house, nor did she hear a vehicle after-wards.
The victim called the Redings and told them that she had been raped and beaten. The Redings took the victim to the hospital. The victim’s injuries included a broken jaw and cuts and bruises to her head and body. She remained in the hospital for three days. Specimens for a rape kit were obtained as well as blood samples from the victim. Swabbings of the victim’s genitalia, anus, and vagina were obtained, as well as hair samples and fingernail clippings. The victim also testified that she had last had sexual intercourse on January 15, 1987.
The assailant wore a ski mask which covered his face except for his eyes. The victim pulled at the mask during the struggle and was able to see that the assailant had a thick, black mustache that came to the corners of his mouth. She also testified that the assailant had a hairy stomach which had a thick dark hairline from his stomach to lower abdomen. The assailant also had a very strong odor of cologne and was wearing faded jeans and had a big shiny belt buckle. She also testified that she tried to scratch the assailant in her struggle to escape. (R. 70) The victim also testified that the assailant had a light to medium build and stated that he was shorter than her husband who was 511" and was of a smaller build. (R. 66)
Boyd Reding called the Courtland Police Department and reported the incident. Officers from the Courtland Police Department drove to the victim’s home and secured the premises. Upon entering the victim’s home, the officers noticed that the home was in disarray. It was evident that a scuffle had taken place. Furniture was turned over, and splinters from the piece of wood were scattered on the floor.
The officers gathered evidence from the scene, including: a pillowcase on the bed where the rape occurred, hair found on the bed, fibers found on the bed, splinters of wood, carpet fibers, and dog hair. The house was also dusted for fingerprints.
A Courtland Police Officer went to the home of the appellant on the night of the rape. This appellant lives approximately two hundred yards from the victim’s home. Officer Vernon Cross testified that he went to the home of the appellant to ask him if he had seen or heard anything. Officer Cross testified that the appellant was dressed in blue jeans without a shirt or belt. He had no smell of cologne and did not conceal his arms or hands, and he did *731 not notice any injuries to the appellant’s arms or hands that night.
Philip Holcomb, of the Alabama Bureau of Investigation, also contacted this appellant. He contacted the appellant on January 30, 1987. The appellant voluntarily agreed to talk to him and stated that he was at his home on the night of the assault. (R. 382-383) On January 31, 1987, Holcomb went to the home of the appellant without a search or arrest warrant. (R. 386) The appellant voluntarily agreed to talk with the officers. The officers asked the appellant if he would come to the police station with them, and he voluntarily accompanied them. (R. 388) The officers took a statement from the appellant from 4:30 p.m. until 10:07 p.m. The appellant also voluntarily allowed finger and palm prints, samples of head hair, pubic hair, and blood and saliva to be taken. (R. 392) He also voluntarily gave the officers his tennis shoes and ski mask which he stated he used for hunting. Officer Holcomb testified that he detected an odor of cologne lingering on the ski mask when he retrieved it from the appellant’s bedroom. This ski mask was shown to the victim. The victim could not identify it by sight, but identified it because of the odor of cologne. The victim stated, “It has a strong odor of the same cologne that I smelled on the man.” (R. 183)
The fingerprints did not match any of the prints lifted from the victim’s home, nor did the tennis shoes match any prints found outside the residence. (R. 401)
Roger Morrison, a forensic serologist with the Alabama Department of Forensic Sciences, testified as to the tests conducted on evidence found at the victim’s home and specimens voluntarily given by the appellant. Mr. Morrison analyzed the blood samples drawn from the appellant, and items in the rape kit gathered from the victim. He also analyzed a stain found on a pillowcase recovered from the bed where the victim was raped. Semen was found on the vaginal swabs, but there was no presence of spermatozoa. (R. 576-577) The tests run on the stain found on the pillowcase resulted in this same finding. (R. 578)
Roger Morrison testified that, “a person who does not produce spermatozoa has a condition known as aspermia.” (R. 578) This condition may be caused by diabetes, tuberculosis, testicular cancer involving both testicles, or blockage such as by a vasectomy. Morris stated that a study had been conducted on the general population by the Metropolitan Police Forensic Laboratory in London, and the study concluded that only “two percent of the sexual assault cases” involved men whose semen lacked spermatozoa. (R. 618)
The state and the defense stipulated that in June, 1984, the appellant had a vasectomy, and the appellant subsequently had a sperm test and was found not to be emitting any sperm.
Morrison also analyzed the blood samples submitted to him. The victim’s blood type is a type A secretor, PGM type 1. (R. 583-586) The semen stains were analyzed and found to be emitted by a man with a blood type A secretor with most likely a PGM type 2-1, although he could not conclusively rule out PGM type 2 because he could have detected the PGM type 1 enzyme from the victim. (R. 594-625) Morrison testified that, “80 percent of all people are secretors, and that thirty-six percent of all people have PGM type 2-1, and 40 percent of Caucasians have type A blood.” (R. 596)
John Kilbourn, a microanalyst with the Alabama Department of Forensic Sciences, testified that he analyzed the hair and fiber samples. These samples were recovered from the victim’s bed: the appellant’s ski mask; known hair samples from the victim, the appellant, and the victim’s husband. He also analyzed samples taken from clothing worn by the victim, nail clippings and pubic hair samples from the rape kit, and pieces of wood recovered from the scene.
Kilbourn found 43 of the victim’s own head hairs on the shirt worn by the victim. There were no fibers of the ski mask, but there were particles of soft wood.
An analysis of the nail clippings from the rape kit revealed nothing, and an analysis of shoe prints found near the driveway *732 revealed that they were probably made by the victim.
Kilbourn also tested the pubic hairs recovered from the bed, but this analysis was also indefinite. The characteristics of pubic hairs from the victim and the appellant were virtually the same; thus, he was unable to identify the hairs. (R. 645)
Kilbourn did find a dark blue acrylic fiber on the pillowcase on the bed where the victim was raped. This fiber was identical to the fiber in the ski mask seized from the appellant. The dye of the fiber was also identical to that of the ski mask. Kilbourn stated that, “in his 19 years as a microanalysis, he had never seen fibers like those found in the pillowcase, and those from the ski mask.” (R. 647, 654) There were also two particles of soft wood found in the ski mask. The stick with which the assailant beat the victim was made of soft wood; however, this appellant is a wood worker, and these particles may have been caused by operating an electric sander. It should also be noted that this type ski mask is commonly sold at K-Mart stores.
Mr. Kilbourn also found fibers on the pillowcase that were not from the ski mask, as well as unidentified hairs.
Mike Ball, of the Alabama Bureau of Investigation, testified that he interviewed the victim while she was in the hospital in order to make a composite sketch. He testified that the victim could not remember if the assailant wore a one, two, or three hole mask, but that she could remember the areas around the assailant’s eyes and mouth. He stated that the victim described the assailant’s eyes, eyebrows, mustache and mouth. She described him as being between 25 and 35 years of age, slender build and medium height.
The State rested and the defense moved for a “Motion of Directed Verdict of Judgment of Acquittal.” This motion was denied. (R. 731) The appellant then presented his case and called the following witnesses in his defense.
The appellant had many abrasions and small cuts on his hands and forearms. He claimed that these injuries were the result of an accident with an electrical sanding machine. The defense called Dr. J.A. Tomlin to the stand to testify as to the types of scratches and abrasions. He stated that, “he could not find any wounds that resembled those which would be made by fingernails.” (R. 763) On cross-examination, Dr. Tomlin was questioned about specific areas near the abrasions. Dr. Tomlin was being questioned in regard to a photograph, State’s exhibit 45. He testified that, “he may not have noticed these scratches, and if he did that he assumed that they were part of the larger abrasions caused by the electrical sander.” (R. 758) He testified that it was possible that these injuries may have been caused by a fingernail.
L.M. Muston testified that he saw the appellant on January 28, 1987. The appellant was picking up his stepchild around 5:30 on the night in question. He testified that he drank a few beers with the appellant at this time.
Patricia Freeman, a neighbor, was called next. She testified that, “on the night of the rape she saw an automobile which appeared to be coming from the Goodwin home around 10:30.” (R. 787) She said she thought “it was a truck with a camper or some type of stationwagon, but that she did not see who was inside of the vehicle.” (R. 788)
Virginia Scott was then called. She testified that she knew that the appellant was a hunter and that she had seen the appellant wearing the ski mask, before. She said “she had seen the appellant with the ski mask pulled down over his face, and that you could see his full face.” (R. 829)
The appellant then testified. He testified that he bought the ski mask in late 1985 for the purpose of keeping warm while hunting and doing outside work. He stated that he bought the mask at the Muscle Shoals, Alabama, K-Mart store. He testified that on the day in question his wife worked the 3:00 p.m. until 11:00 shift. He said that he picked up his stepdaughter that evening at L.M. Muston’s home and drank three beers with him. He said that he put his stepdaughter to bed around 8:30 p.m. and he went to bed shortly thereafter. *733 He said that his wife woke him at 11:00 because Officer Vernon Cross was at the door. He put on his jeans and went to the door wearing no shirt. He stated that he had no significant scratches on his body at this time. He did say that he burned his arm on an electric sander the following night. He also stated that he is 5'11" and weighs 145 pounds and is a regular cigarette smoker. He also testified that he volunteered every specimen and sample that the police requested, as well as giving them his ski mask.
The appellant also testified as to physical traits which could distinguish him from the assailant. He testified that he has large scars on his abdomen from a double hernia operation, as well as a deformed leg which is the result of childhood polio. He stated that, as a result of polio, he walks with a limp.
The wife of the appellant also testified corroborating his testimony. She also stated that she did not notice any smell of cologne on her husband. She also testified that she first noticed the burns on the appellant’s arm the next day. She also stated that his arms were regularly scratched and cut as a result of working with wood.
“The standard for appellate review of the sufficiency of the evidence in a ease such as this one was aptly set out in Dolvin v. State, 391 So.2d 133 (Ala.1980).
“ ‘ “In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir.1974); United States v. McGlamory, 441 F.2d 130 (5th Cir.1971); Clark v. United States, 293 F.2d 445 (5th Cir. (1961).
“ ‘ “[W]e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir.1969); Roberts v. United States, 416 F.2d 1216 (5th Cir.1969); The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855 (5th Cir.1967):
“ ‘ “ ‘Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949.... The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is to examine the welter of the evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged. McGla-mory, 441 F.2d at 135 and 136.’ ” ’ (Emphasis in original.)
“391 So.2d at 137-38, quoting Cumbo v. State, 368 So.2d 871-874 (Ala.Cr.App. 1978), cert, denied, Ex parte Cumbo, 368 So.2d 877 (Ala.1979).”
Robinette v. State, 531 So.2d 697 (Ala. 1988).
In this cause, even though most of the evidence presented was circumstantial, there was sufficient evidence placed before the jury to sustain the appellant’s conviction. This evidence was sufficient to allow the jury to infer the appellant’s guilt beyond a reasonable doubt. McCrory v. State, 505 So.2d 1272 (Ala.Cr.App.1986); Locke v. State, 527 So.2d 1343 (Ala.Cr.App. 1977).
The description of the assailant given by the victim matches the characteristics of this appellant. The appellant and the assailant were similar in height, build, skin tone, and both have a thick black mustache. *734 The victim identified the ski mask worn by the assailant as being “the same one” taken from the appellant’s home by officers. She identified it by the smell of cologne which was the same as the smell she remembers on the night of the rape. Soft wood particles were also found in the mask similar to those of the stick used by the assailant to strike her. Fibers from the mask also matched fibers found on the pillow in the victim’s home. These fibers also matched the color. The victim also described a large belt buckle like one owned by the appellant. Furthermore, the semen of the assailant was also analyzed and found to be a blood type A, secretor, PGM type 2-1, and emitting no sperm. The blood type of the appellant is a blood type A, secretor PGM type 2-1. Also the appellant has had a vasectomy, and has been tested and found to emit no sperm. Moreover, the appellant lived within two hundred yards which supports the victim’s statement that she heard no vehicle either leave or approach her house.
II
This court has carefully considered the appellant’s other arguments with reference to the alleged removal of marijuana from the victim’s home. We have also noted the fact that this appellant walks with a limp due to a leg deformity and the issue of “distinctive scars” on the appellant’s body. This court has also considered this appellant’s testimony and the testimony of his wife.
All of the above issues present questions which were properly presented to the trial jury which resolved these matters against the appellant.
We have carefully reviewed this record and find no error. For reasons herein cited, this cause is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur.